Filed 8/20/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | D073807 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519664B) |
| v. | |
| T.B. et al., | |
| Defendants and Appellants. | |

APPEALS from findings and orders of the Superior Court of San Diego County, Michael Popkins, Judge. Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant T.B.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant L.B.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

T.B. and L.B. appeal findings and orders adjudicating their younger son a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivision (j),[1] and removing him from their custody under section 361, subdivision (c)(1). They do not challenge findings and orders under sections 300, subdivision (a) and 361, made on behalf of their older son, Jordan, who suffered serious injuries as a result of the parents' routine practice of hitting him with a belt as punishment. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

T.B. and L.B. have two sons, six-year-old Jordan,[2] and two-year-old D.B. On January 28, 2018, when Jordan arrived at school, his teacher noticed he was limping badly and blood was seeping through his jeans. Jordan said his right leg hurt "all the way up." Examinations revealed numerous linear marks, mainly on his right thigh, in different stages of healing. In many areas, the marks had scabbed over. He had a two-inch scar on his middle back. Jordan's skin was broken in some places and he was bleeding. Jordan was wearing a shirt held together by a safety pin and it appeared that his hair had not been recently groomed. He refused to talk to the social worker.

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

[2] T.B. is Jordan's presumed, but not biological, father. For brevity, we refer to T.B. as Jordan's father.

Jordan's mother, L.B., told a social worker several times that Jordan was injured in a fall. When questioned again, she said T.B. had given Jordan a beating. Reached by telephone, T.B. told the social worker that Jordan fell. The social worker told T.B. she did not believe him, and he said, "I beat him last night." When the parents arrived at Rady Children's Hospital, they informed the social worker that the previous evening L.B. hit Jordan with a belt approximately 15 to 20 times after he ate four doughnuts without permission. The parents said they routinely disciplined Jordan by hitting him with a belt or by making him exercise. L.B. and T.B. each said they were disciplined in a similar manner when they were growing up and, in later interviews, described childhoods with significant physical, and in L.B.'s case, sexual abuse.

The parents denied using physical discipline on D.B., who was then 18 months old. D.B. did not have any bruises, marks or injuries. T.B. said he was trying to protect his wife when he said he had beaten Jordan. They physically disciplined Jordan approximately four times a month using a belt. T.B. said he kept the buckle in his hand, folded the belt, and hit Jordan between five and 15 times, depending on the situation. T.B. did not believe it was appropriate to hit a child with a broom or other household item, but believed it was appropriate to hit a child for two to five minutes. The child should be told why he was being hit.

A pediatric child abuse specialist determined Jordan's injuries were consistent with inflicted child abuse. The pattern of injuries on his body indicated he was hit with a belt and belt buckle. The parents could not tell the doctor how many times they had hit

3

Jordan with a belt, but acknowledged it was more than 20 times. They denied ever hitting D.B.

In a later interview, L.B. told the social worker that prior to this incident she and T.B. "didn't see beating kids as an issue" and they lived by the motto "spare the rod spoil the child." L.B. denied that any of the previous beatings had left marks on Jordan. She claimed the older scars on Jordan's body were "old scars from him being a kid." She was "not stressed out or angry . . . just level-headed" when she hit him with the belt for eating doughnuts without permission. L.B. acknowledged her actions were "excessive and abusive." She said she and T.B. had hit Jordan with a belt less than 10 times and reports they had hit him more than 20 times were incorrect. When asked why she initially said Jordan had fallen, L.B. described an incident in the park in which a little girl who was riding a bicycle collided with Jordan, knocking him down. Jordan got right up and did not appear to have been injured in the accident.

T.B. said they had placed Jordan on restriction three months earlier for taking food and other items without permission. He would take chips and candy and hide them in the couch or his bed, and would lie about it when the food was still in his mouth. Jordan was not allowed to go into the kitchen without permission. Even though there were crumbs all over him and the couch, Jordan denied eating the doughnuts. T.B. said he let L.B. discipline Jordan and went upstairs to bathe D.B. He could hear Jordan screaming and crying. He now felt that the incident was excessive and said he and L.B. needed to make sure it never happened again.

4

After several initial visits with his parents, during which he was quiet and withdrawn, six-year-old Jordan refused further visits with his parents, even when they arrived to see him. He did not want to see his little brother. When told his parents were there to see him, Jordan would start crying and say he was scared. His caregiver reported that if they drove near the parents' home, Jordan would become tense and say, "don't turn there." Once, when he thought the caregiver was taking him to his parent's house, Jordan said, "No, scared, sad, scared." The caregiver said Jordan was constantly hungry, even after eating a full meal, and was hoarding food. Jordan told her that his mother had hit him with a clothes hanger. School staff reported that Jordan's behaviors had completely changed after he was removed from his parents' care and he was more active and verbal.

D.B. was doing well in foster care. There were no concerns about his development. His visits with his parents were positive, active, and pleasant. The parents gave clear directions to him, took time to teach him new things, and encouraged him with praise.

The jurisdictional and dispositional hearings were held on March 29, 2018. The parents submitted on the jurisdictional allegations of physical abuse in Jordan's case, and the juvenile court proceeded with a contested hearing in D.B.'s case. The San Diego County Health and Human Services Agency's court reports, as detailed above, were admitted in evidence. In an updated report, the social worker said the parents immediately started actively participating in services, with positive feedback from the service providers. The service providers said the parents understood the connection

between how they were raised and how they decided to discipline their children, and accepted responsibility for their actions.

The social worker reported that Jordan continued to refuse to visit his parents. She believed it was unusual for a child that young to not want to see his mother or father. The parents' visits with D.B. were going well. The social worker said D.B. remained at risk of physical abuse because of the frequency and severity of the parents' physical abuse of his brother. D.B. was highly vulnerable to abuse due to his age, nonverbal status, and entry into a developmental stage typically associated with defiant and/or unruly behaviors. The parents had not had sufficient time to demonstrate they were able to handle their children's challenging behaviors without resorting to physical discipline.

L.B. testified she started using a belt to discipline Jordan when he was five and a half years old. She never used corporal punishment on D.B. She was participating in a parenting class and was learning noncorporal disciplinary techniques. L.B. was also taking a child abuse class, which she described as eye-opening. She would never again resort to corporal punishment. L.B. acknowledged Jordan could not be returned to her care because they were still learning how to properly discipline him. She felt that she and T.B. were more than capable of properly caring for D.B.

T.B. testified he was participating in services. He completed a Positive Parenting course and was participating in an eight-week anger management class. He understood that violence in the home affected babies. During a visit, T.B. implemented a new technique when D.B. started throwing a tantrum. T.B. knelt and talked to him, and then made a game out of putting away the toys. He denied he or L.B. had ever physically

6

disciplined D.B. He acknowledged they did not know how to deal with Jordan, who had been exhibiting challenging, disruptive, and defiant behaviors at home and at school.

The juvenile court said the parents were intelligent and articulate, and had gained insight and made some progress in services. However, the undisputed evidence showed that they had seriously physically abused Jordan. In assessing whether D.B. was at substantial risk of abuse or neglect, the juvenile court considered D.B.'s age and the fact he was the same gender as his abused sibling. The court found that D.B. had suffered emotional abuse by hearing his brother scream as he was being beaten by a belt. The reason for the beating–that a child had eaten doughnuts without permission–was an aggravating risk factor. Although the parents had made progress with services, the court had concerns about their credibility in view of their false statements to the social worker. The court sustained the jurisdictional allegations as to D.B. under section 300, subdivision (j) by clear and convincing evidence, and removed him from the physical custody of his parents.

DISCUSSION

A

Issues on Appeal

T.B. and L.B. contend there is not substantial evidence to support the jurisdictional and dispositional orders for D.B. under sections 300, subdivision (j) and 361.5, subdivision (c)(1). T.B. asserts the juvenile court erred by failing to apply statutory factors required under section 300, subdivision (j). He argues because section 300, subdivision (j) does not reference section 300, subdivision (c), which permits jurisdiction

7

on grounds of emotional abuse, the finding that D.B. suffered emotional abuse was not a valid basis for jurisdiction under subdivision (j). He further contends that at the time of the hearing there was no evidence to show that D.B. would be at substantial risk of abuse or neglect if returned home and the juvenile court failed to consider whether there were reasonable means by which D.B.'s physical health could be protected in the home.

L.B. asserts the jurisdictional findings should be dismissed because the incidents of corporal punishment to Jordan do not constitute substantial evidence to support the finding that D.B. was at substantial risk of suffering serious physical harm. She contends the dispositional order removing D.B. from their custody should be reversed because she took proactive measures to learn new parenting techniques and expressed remorse for using corporal punishment, and an in-home safety plan could have been implemented to protect D.B.

B

Relevant Law and Standard of Review

At the jurisdictional hearing, the court considers only the question whether the child is described by one or more subdivisions in section 300. Section 300, subdivision (j) provides that any child may come within the jurisdiction of the juvenile court if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any

8

other factors the court considers probative in determining whether there is a substantial risk to the child."[3]  In enacting section 300, subdivision (j), the Legislature intended " 'to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). Subdivision (j) *does not* state that its application is limited to the risk that the child will be abused or neglected *as defined in the same subdivision* that describes the abuse or neglect of the sibling.  Rather, subdivision (j) directs the trial court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) *or* (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.' "  (*In re I.J.* (2013) 56 Cal.4th 766, 774 (*I.J.*).)  "Because the assessment of risk to a sibling depends in part on the circumstances of an abused or neglected child, 'subdivision (j) implies that the more egregious the abuse, the more appropriate for the

---

[3]    Here, the child's sibling was adjudicated a dependent of the juvenile court under section 300, subdivision (a), which states:  "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.  For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm.  For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury."

juvenile court to assume jurisdiction over the siblings.' " (*In re D.C.* (2015) 243 Cal.App.4th 41, 53, quoting *I.J.*, at p. 778.)

At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child (detriment finding). (§ 361, subd. (c)(1).) The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136 (*T.V.*).)

We review the entire record to determine whether the trial court's jurisdictional and dispositional findings are supported by substantial evidence. Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. We draw all legitimate and reasonable inferences in support of the judgment. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 (*Dakota H.*).)

C

Analysis

1.      *The juvenile court properly considered the totality of D.B.'s circumstances under section 300, subdivision (j).*

We are not persuaded by T.B.'s argument the juvenile court failed to properly consider the statutory factors described in section 300, subdivision (j), and further erred by basing its decision on a finding that D.B. had suffered emotional abuse.  Section 300, subdivision (j) requires the juvenile court to consider " 'the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' "  This "expansive statutory language" has been interpreted to require the juvenile court " 'to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in [section 300,] subdivision (j).' "  (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 982-983.)

Contrary to T.B.'s claim, the record shows the juvenile court considered the statutory factors enumerated in section 300, subdivision (j).  The court explicitly considered D.B.'s age and gender, and the mental condition of the parents, noting they were intelligent and articulate, and had gained some insight.  The court expressed concerns about the parents' credibility in view of their changing stories and the misinformation they had provided to the social worker.  The court found that the reason

11

the parents gave for physically disciplining Jordan–that he ate four doughnuts without permission–made the abuse more egregious. The record thus belies T.B.'s argument the juvenile court did not properly consider the enumerated statutory factors.

Similarly, we are not persuaded by the argument the juvenile court improperly based jurisdiction for D.B. on section 300, subdivision (c),[4] which is not included as a statutory ground for jurisdiction under section 300, subdivision (j). In making this argument, T.B. misconstrues the juvenile court's findings. The record shows the juvenile court explicitly found that the physical abuse in Jordan's case was "very, very serious" and that this finding alone would support jurisdiction on behalf of D.B. under section 300, subdivision (j).[5] The court then considered the enumerated statutory factors, as described above. In addition to considering those factors, the court also found the parents had subjected D.B. to emotional abuse. The finding of emotional abuse was not the basis for dependency jurisdiction, as T.B. argues, but part of the court's consideration of the totality of the circumstances surrounding the abuse or neglect of the sibling.

---

[4] Section 300, subdivision (c), is a ground for dependency jurisdiction where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." (§ 300, subd. (c).) It is not referenced in section 300, subdivision (j).

[5] The juvenile court's finding that D.B. was at substantial risk of serious physical harm due to his parents' physical abuse of his sibling also supports jurisdiction under section 300, subdivision (a). (See fn. 3, *ante*.)

12

Section 300, subdivision (j) clearly states the court may consider any other factor it considers probative in determining whether abuse or neglect of a sibling presents a substantial risk to the child. Here, the juvenile court considered the emotional effect on D.B. of hearing his brother scream and cry as his mother hit and injured him with a belt, and found it to be a probative factor in determining whether there was a substantial risk of harm to D.B. The court was correct. The parents' lack of attention to, or disregard for, the effect their physical abuse of Jordan had on D.B. is relevant to the totality of the circumstances risk analysis required under section 300, subdivision (j).

2. *There is substantial evidence to support the jurisdictional findings*.

L.B. contends the section 300, subdivision (j) finding is not supported by substantial evidence because: (1) the parents' past use of corporal punishment on Jordan does not support a reasonable inference D.B. was at substantial risk of serious physical harm; (2) there is no evidence to show the parents had ever inappropriately disciplined or physically harmed D.B.; (3) the parents admitted error, were remorseful, and had learned effective parenting techniques and addressed child abuse issues through services; (4) the parents did not begin using corporal punishment on Jordan until he was five years old and they hit him only a total of 10 times; (5) D.B. was not at risk because he would not be the same age as Jordan was when the abuse started for more than three years; and (6) there were no other risk factors in the home.

T.B. argues by the time of the jurisdictional hearing, there was no current risk to D.B. in the home. The parents were participating in services and were remorseful, and their visits with D.B. were going well.

13

The parents do not meet their burden on appeal to show there is no evidence of a sufficiently substantial nature to support the findings or orders. (*Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.) We reject L.B.'s argument the parents hit Jordan with a belt only 10 times in his life. The record shows the parents admitted to *routinely* using a belt to discipline Jordan. T.B. said he or L.B. hit Jordan with a belt approximately four times a month, striking him each time from five to 15 times depending on the circumstance. The parents believed sparing the rod spoiled the child. L.B. told the social worker that before the children were detained in protective custody, she and T.B. did not "see beating kids as an issue." Jordan's caregiver reported that Jordan said L.B. hit him with a clothes hanger. Jordan had wounds on his body in different stages of healing, from which we draw the reasonable inference he was subjected to beatings inflicting injury on multiple occasions.

Jordan refused any contact with his mother and father, saying he was afraid of them. The social worker said it was unusual for a young child to refuse visits with his parents. Jordan was afraid to drive past his parents' home. This evidence suggests Jordan was severely traumatized by physical abuse, and the extent and nature of the abuse was far greater than the parents acknowledged. L.B. and T.B. each acknowledged they were just starting to learn appropriate child disciplinary techniques and how to implement those techniques. T.B. testified he did not know how to deal with Jordan's challenging, disruptive, and defiant behaviors. The social worker noted that D.B. was on the verge of "the terrible two's," a developmental stage that often brings many parenting challenges. The social worker believed there was a risk the parents would not handle those challenges without resorting to physically disciplining D.B.

14

In addition, contrary to the parents' claims, there were risk factors in the home other than physical abuse. Jordan's constant hunger and practice of hoarding food may evince emotional trauma and/or food deprivation. He was not permitted to enter the kitchen in his home without permission. The record also supports the conclusion one or both parents were inattentive to Jordan to the point of neglect when they sent him to school, limping badly, with blood oozing from his jeans. Although a relatively minor point, the fact Jordan was disheveled and his hair apparently had not been groomed for some time also points to parental neglect.

Even if the juvenile court had concluded, which it did not, that the parents had credibly mitigated the risk to D.B. by participating in services for four or five weeks and disavowing the use of corporal punishment, there would be substantial evidence to support the juvenile court's finding under section 300, subdivision (j). At the time of the jurisdictional hearing, D.B. was 18 months old. He was vulnerable because of his age, size, and nonverbal status. Our Supreme Court explains: " 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.' . . . In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*I.J.*, *supra*, 56 Cal.4th at p. 778.) Here, the record permits the reasonable inference that in view of

15

Jordan's multiple injuries and D.B.'s age, even a single episode of corporal punishment could have devastating consequences to D.B.'s physical health and safety. We conclude there is ample evidence to support the juvenile court's finding that D.B. was a child described by section 300, subdivision (j).

3.      *Substantial evidence supports the dispositional findings.*

"The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home." (*T.V.*, *supra*, 217 Cal.App.4th at p. 135.) In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) The juvenile court must also consider whether there are any reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody. (§ 361, subd. (c)(1); see §§ 202, subd. (a), 16500.5, 16501, 16501.1.)

We are not persuaded by the parents' claim reversal of the dispositional order is required because there was no longer a current risk to D.B. in their care. They rely on *In re Jasmine G.* (2000) 82 Cal.App.4th 282 (*Jasmine G.*), in which a division of this court reversed a dispositional order removing a 15-year-old girl from parental custody who was adjudicated a dependent due to excessive physical discipline. The parents expressed remorse for their actions, attended services, and the child wanted to return home. The social worker believed there was a current risk to the child if returned home because the parents lacked a full understanding of adolescent issues. (*Jasmine G.*, at pp. 284, 286,

16

288-289.) The reviewing court held there was not substantial evidence to support the removal order. (*Id*. at p. 289.)

The circumstances here are not comparable to those in *Jasmine G*. This is a case in which the parents repeatedly physically abused the child's sibling and the juvenile court found, by clear and convincing evidence, that D.B. was at substantial risk of harm to his physical safety. (§ 300, subd. (j).) A 15-year-old child may be able to protect herself against corporal punishment or call for help; an 18-month-old child cannot. Corporal punishment presents a far greater risk of injury–and serious injury–to a toddler than it does to an older teenager. In addition, here, the juvenile court expressed concern about the parents' credibility in renouncing the use of corporal punishment.

The record shows the juvenile court considered the parents' past conduct and viewed it as a very serious case of physical abuse of a child. Although the court found the parents had made "some progress" and had gained "some insight" as to their parenting practices, the court determined "it was just too soon" to conclude D.B. would not be at substantial risk of physical abuse were he returned home. The court could not dismiss the possibility the parents were saying only what they expected the court wanted to hear. In view of the parents' credibility issues and the severity of abuse on the sibling, the juvenile court reasonably found there would be a substantial danger to D.B.'s physical health, safety, protection, or physical or emotional well-being if returned home, and there were no reasonable means to protect his physical health without removal from the parents' custody. (§ 361, subd. (c)(1).) We conclude there is substantial evidence to support the dispositional findings and orders. (*Dakoka H., supra*, 132 Cal.App.4th at p. 228.)

17

DISPOSITION

The findings and orders are affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

GUERRERO, J.