Filed 6/21/22  In re G.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re G.S., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D079935 |
| Plaintiff and Respondent, | (Super. Ct. No. J520655B) |
| v. | |
| Y.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin Rae, Chief Deputy County Counsel, and Emily Harlan, Deputy County Counsel for Plaintiff and Respondent.

Y.S. (Mother) appeals from a juvenile court order removing her now 12-month-old daughter, G.S., from her custody, based on severe physical abuse to her older daughter, L.S., by G.S.'s father.[1]  Mother contends there is no substantial evidence to support removal.  The San Diego County Health and Human Services Agency (Agency) maintains removal was appropriate and supported by the record.  We agree, and affirm.

PROCEDURAL AND FACTUAL BACKGROUND

A.    *Underlying Events*

L.S. was born in October 2018.  Mother and Father began dating in 2020, and were living together by early 2021.

On February 3, 2021, L.S. was taken to Rady's Children's Hospital because of vomiting the previous day.  She had bruises "all over her body," including "her chest, ear, left arm, left thumbnail, left upper cheek, forehead, left first toe, right side nostril and under her left eye."  She also had a liver laceration and internal bleeding, suggesting renal gland bruising, and needed a blood transfusion.  Child abuse expert Dr. Shalon Nienow said this was a " 'near fatality' case," and if the parents "waited any longer [L.S.] could have died."  She opined the organ injuries were from " 'extreme violent forces' which could have been a 'kick or punches' to the abdomen"; the chest bruises were from punching; and the toe bruising was from biting.  She also said Mother and Father had multiple, unreasonable guesses for the injuries, and while some injuries might be accidental, there were "multiple factors . . . indicative of abuse," including the "sheer number of bruises."

---

[1]    L.S. and her father, I.B., are not parties to this case, and G.S.'s father, M.G. (Father), is not a party to the appeal.  We discuss them as necessary.

A social worker spoke with maternal aunt E.S., who sometimes stayed with Mother and Father. She said that on February 2, while she and Mother were at work, Father called Mother to tell her L.S. was throwing up. When they returned home, L.S. "had bruises all over her body," and Mother reportedly said "she falls a lot." An "underage collateral" (who appeared to be a maternal niece) said she had seen Father "hitting [L.S.] with a close[d] fist."

The Agency filed a petition for L.S. under Welfare and Institutions Code, section 300, subdivision (e), alleging she experienced severe physical abuse; Mother and Father were her primary caretakers; and they were unable "to provide a reasonable explanation."[2] L.S. was detained in a foster placement.

B.    *Detention*

G.S. was born in June 2021. She was placed under a temporary safety plan with Mother in the maternal grandparents' home, and they agreed to supervise all contact with Mother. The Agency then obtained a protective custody warrant, and filed a petition under section 300, subdivision (j), alleging G.S. was at substantial risk of serious harm for the same reasons as L.S.'s petition.

The Agency's detention report addressed the events surrounding L.S.'s case and noted Mother started services, but had "not made significant progress," due to scheduling conflicts. It also addressed the parent's input and Agency's concerns.

Social workers met with each parent after G.S.'s birth, and asked about L.S.'s injuries. Mother said she "never had any suspicion and was not aware," the maternal aunt did not "warn her," and her niece "did not express

---

[2]    Further statutory references are to the Welfare and Institutions Code.

3

feeling uncomfortable" around Father. She acknowledged she "did not know how to protect her daughter in that moment," so was "taking advantage of . . . services." She noted Father tried to see G.S. at the hospital, but was not allowed. The social worker subsequently asked Mother what she thought happened with L.S., and she said Father "hurt" her.[3] But she also said L.S. was vomiting due to a stomach infection, and when asked if Father was "ever . . . violent with her or [L.S.]," she denied this and said, "[W]e were good. I don't know." The social worker asked how she would keep G.S. safe, and Mother said Father did not know where they lived, and she would not let him see G.S. As for Father, he denied disciplining L.S. He suggested their dogs made her fall and a "maternal . . . cousin would play rough," but could not explain the internal damage. He said he last spoke to Mother two months earlier, and she "asks . . . if [he] knew something," but "hasn't blamed" him. He had a picture of G.S. on social media, and said he obtained it from a cousin.

The Agency's concerns included that Mother lacked "insight into why [L.S] was removed" and was not "prepared to take . . . responsibility." It also suggested the parents might still be in touch, citing Father's attempted hospital visit, his picture of G.S., and that the parents lived nearby. The Agency noted the grandparents could not begin the resource family approval process while Mother lived there.

At the detention hearing, the juvenile court detained G.S. in a licensed foster home. The court noted Mother was "new in her services," had asked for individual therapy, and it thought "that would be really helpful."

---

[3]     Some of Mother's statements are in Spanish and English in the Agency reports. For clarity, we use the English statements.

4

C.    *Jurisdiction and Disposition*

The Agency filed its jurisdiction report in July 2021, and recommended removal and denial of reunification services. The report provided further input on the parents, including from relatives.

In late June 2021, a social worker spoke with each parent again. Mother said Father "treated L.S. . . . as if she were his own" and "was very loving." She said L.S. "would sometimes fall"; the dogs sometimes jumped on her; and she once got her head stuck in a railing and had an unexplained foot injury. Father said Mother's niece had dropped L.S. on her head three days before the incident, and that L.S.'s orthopedic doctor said the bruises were normal. Father's criminal history reflected 2018 charges for attempted sexual conduct with a minor and related conduct; Mother was aware of an incident, but not the details.

The social worker talked to other relatives as well. The paternal grandmother said she was present when L.S. went to the hospital and questioned Mother and Father, and they said they "did not do anything." Maternal aunt Y.S. reported Mother told her "there was something on [L.S.'s] stomach, but was unable to explain." Y.S. also indicated L.S. had frequent accidents and she told Mother that L.S. "was no longer extending her arms to prevent her fall." The maternal grandfather expressed interest in placement.

As for services and visitation, Mother enrolled in a child abuse group, started therapy, and attended parenting classes. Her therapist said she reportedly scheduled a medical appointment, due to L.S. feeling ill and vomiting, but L.S. went to the hospital before the appointment. Mother visited G.S. twice per week, and called on other days.

The Agency recommended removal and denial of services due to the severity of L.S.'s injuries and delayed treatment, and because Mother lacked

insight and had not shown she could ensure G.S.'s safety. At the initial jurisdiction and disposition hearing, Mother set the matter for trial.

The Agency's August 2021 addendum report addressed further input from Mother and her service providers. She reported she was "learning many things," including about trauma and when to take a child to the doctor. She said she could prevent injuries "by being more . . . alert," and when asked if she would have done something differently, said "she would have worked less." As for whether she saw "red flags," looking back, Mother said L.S. did not cry when she left for work, which would have been a sign. She also echoed Father's input that the orthopedic doctor said her bruising was normal, and said L.S. "would fall while running" and "would not block [a] fall with her hands because she did not want to get her hands dirty." Mother then said she understood she "made a huge mistake and was with the wrong person."

Mother's abuse group provider said she actively participated and appeared to learn the material, but it was "too early to tell" how Mother would progress in the class and "difficult to assess how [she] applies it in real life." Her parenting services provider, who had worked with her since February 2021, said she still denied knowing how L.S.'s injuries happened or that there were signs, but "realiz[ed] [Father] could have done this and actually hurt [L.S.]." She noted Mother thought L.S.'s bruises were from her hip dysplasia, and commented she was "very naive." When asked about services, Mother's therapist said, "Why not give her the opportunity to try? And go slower, but I don't know if that's an option." She said Mother could relate what she was learning, but they had "to see if she puts it into practice," and noted Mother herself was "very young." The therapist also noted that Mother "seem[ed] to focus on defending how [Father] was a good father."

6

The Agency provided further addendum reports in late 2021 and early 2022, and now recommended reunification services.

In September 2021, Mother told the social worker she "prefers never to see [Father], but understands they have a daughter in common." She said L.S. "obtained her injuries . . . under [Father's] care and he was the only one responsible," but took responsibility for not taking L.S. to the doctor sooner. When the social worker asked about L.S. being seen with bruises before her hospitalization, Mother said she believed Father and "thought he was a good person." When her therapist asked her about not seeing the red flags, she similarly said she believed Father, and that the "maternal aunt did not tell her" and she was "very focused on her work." Her therapist did report she could "verbalize the different types of abuse" and "accidental verses non-accidental injuries." They also discussed how Father's visitation would work, and Mother said "she would be attentive to how the child left and . . . return[ed]," and "not just take [his] word . . . ." The grandfather remained interested in placement, and said he would abide by rules set by the Agency.

In its November 2021 addendum report, the Agency observed Mother had "gained some insight," and could "differentiate age appropriate versus non-accidental injuries" and respond when her child was ill, but was "in the early stages of treatment and working on demonstrating these behavior changes consistently and over time." It recommended services so she could "continue to increase her insight and be able to demonstrate that she could put her child's safety ahead of her own."

In early December 2021, the maternal grandparents were approved for placement, and G.S. was placed with them. Mother had two visits per week, and phone calls three days per week. A progress report from Mother's abuse group provider reflected she achieved treatment goal marks of "4" ("[o]ften")

and "5" ("[v]ery often, routinely") on most goals, including understanding child abuse concepts, but had a "0" ("not addressed yet") for some goals, including being able to "describe components of safety planning" and "describe own prevention and intervention plans the parent will use to keep the child safe." The report noted a "[r]elapse prevention plan will be developed by the client prior to graduation." In an addendum report that month, the Agency said it would expand visitation to short, structured, unsupervised visits.

A final addendum report noted a juvenile court made a true finding on L.S.'s petition and removed her from Mother. L.S.'s petition also was amended to state Mother "knew or reasonably should have known that [Father] was physically abusing [L.S.] and failed to protect her."

D.    *Contested Jurisdiction and Disposition Hearing*

The contested jurisdiction and disposition hearing was in January 2022. The juvenile court received the Agency reports into evidence, and took judicial notice of L.S.'s petition and detention, jurisdiction, and disposition minute orders, over Father's objection.

The parties stipulated to Mother's offer of proof that the maternal grandfather would testify that "if the judge allows [Mother] to live in [his] home on the condition that all contact between her and [G.S.] be supervised, [he] would gladly abide by the court's order." He would further testify that Mother "has a private bedroom available to her"; G.S. "sleeps in a crib in [his] bedroom," which he locks at night; and only he and his wife have a copy of the key. The juvenile court accepted the stipulation.

During closing arguments, Mother's counsel contested jurisdiction and removal, and requested that if the court proceeded with removal, she be allowed to live in the grandparents' home.

8

The juvenile court found by a preponderance of the evidence that G.S. was a child described in section 300, subdivision (j). The court explained it considered the abuse to L.S., and described the injuries and input from child abuse expert Dr. Nienow, including her view that L.S. "could have died." The court determined that "based upon those significant injuries to [G.S.'s] sibling and the fact that the protective issue, which is the physical abuse, has yet to be fully addressed," G.S. "would be at substantial risk." The court noted Mother had not completed services and her progress report showed she had "yet to cover specific areas within her treatment, including a relapse prevention plan."

The juvenile court then found by clear and convincing evidence that removal was necessary because of "detriment to the safety, protection, physical or emotional well-being of the child and, again, that's for the same reasons." The court recognized Mother was making progress, but said it was "still early on in . . . services," "services had not been completed," and there were "several treatment areas as to [Mother] that still need to be covered, including a relapse prevention plan to prevent future physical abuse." The written order stated reasonable efforts were made to prevent removal, and there were no reasonable means to protect G.S.'s physical health without removal. The court also denied Mother's request to live with the grandparents, and granted Father reunification services and supervised visitation. Mother timely appealed.

## DISCUSSION

A. *Applicable Law*

To enter an order removing a child from parental custody, the juvenile court must find clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or

9

emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The court must also determine if "reasonable efforts were made to prevent . . . the need for removal" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328 (*D.B.*).) The court may consider the "parent's past conduct as well as present circumstances." (*Id.* at p. 332, citing *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

We review the court's removal order for substantial evidence, bearing in mind the heightened clear and convincing evidence standard of proof. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1657; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996 (*O.B.*).) The question before us is "whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*O.B.*, at p. 1011.) We "must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, at pp. 1011-1012.) The "appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders." (*D.B.*, *supra*, 26 Cal.App.5th at pp. 328-329.)

10

B.    *Analysis*

    1.    *Substantial Danger*

The record reflects G.S. would be in substantial danger in Mother's custody.  (§ 361, subd. (c).)  L.S. experienced near-fatal abuse by Father, while in the parents' care in February 2021.  By the time G.S. was born in June 2021, and even later, Mother still offered multiple, unreasonable causes for L.S.'s injuries (e.g., dogs jumping on her; not blocking falls to avoid dirt), denied violence by Father, and called him a "loving" parent.  Although she pursued services and learned about abuse, she did not resolve the protective issue by disposition.  Rather, her abuse group provider and therapist did not yet know if she could apply what she was learning, and she had not done safety planning or made a relapse prevention plan.  There was other evidence G.S. was at risk, too.  By September 2021, Mother still minimized her role in L.S.'s injuries, claiming Father was the "only one responsible"; suggesting her failure was in not taking L.S. to the doctor sooner; and citing her work and an aunt's lack of warning among reasons she did not see signs of abuse.  Further, Father was granted reunification services, so potentially would be in G.S.'s life, and the Agency already had concerns about the parents being in contact when G.S. was born.  These circumstances underscored the need for Mother to show she could accept responsibility for keeping G.S. safe, and do so.

Substantial evidence thus reflected G.S. remained at serious risk of harm absent removal.  (See *D.B., supra*, 26 Cal.App.5th at p. 333 [substantial evidence supported removal order based on physical abuse to sibling, where juvenile court found "parents had made 'some progress' and . . . gained 'some insight,' " but " 'it was just too soon,' " citing the severity of the abuse and parents' credibility issues].)

11

Mother disagrees, and argues circumstances had changed: she had pursued services and visitation, gained insight, and no longer spoke to Father. She essentially asks us to reweigh the evidence, which we cannot do. (*O.B.*, *supra*, 9 Cal.5th at pp. 1011-1012.) Her specific points also lack merit.

First, Mother argues that scheduling conflicts caused initial delays in services in L.S.'s case, and she has since completed parenting services and participated in the abuse group and therapy. Her progress is commendable, but the focus is on "averting harm" to G.S. (*D.B.*, *supra*, 26 Cal.App.5th at p. 328.) Regardless of when Mother started services, she has not completed them, including the key step of preparing a relapse prevention plan. Mother also contends she was attentive to G.S. with visits and calls, and the Agency planned to transition her to structured, unsupervised visits. That does not mean the Agency felt she was ready to keep G.S. safe from abuse, hence its recommendation for removal.

Second, Mother argues she "demonstrated growth and insight," and the Agency acknowledged as much. She explains that although she "struggled . . . to come to terms" with L.S.'s abuse and continued to "not know" how her injuries occurred, she "quickly" concluded Father was the perpetrator and told a social worker she "made a huge mistake and . . . was with the wrong person." This portrayal rests on drawing inferences in favor of Mother, contrary to substantial evidence review (*O.B.*, *supra*, at pp. 1011-1012), and is unpersuasive regardless. Although Mother claimed she ceased contact with Father after the situation with L.S. (which we discuss next), she cites no evidence she blamed him until after G.S. was born, and Father denied she had. Mother continued to identify implausible causes for L.S.'s injuries and describe Father favorably for some time. Even after she "gained some insight" (as the Agency did acknowledge), and admitted Father abused

12

L.S. and it was a mistake to be with him, she still lacked full insight into how L.S. was hurt and her role in not protecting her. And, as the Agency elaborated and the record reflects, she was still working on demonstrating she could apply the insights.

Third, Mother argues she and Father were not in contact. For one thing, it is not clear when they stopped speaking. Mother said contact ended after the incident with L.S., in February 2021, but Father indicated they spoke two months before G.S.'s birth, in April 2021. The Agency also had concerns they were in touch when G.S. was born, including based on Father's attempt to visit her in the hospital. Further, even if they did end contact, the grant of services to Father meant Mother might not be able to rely on a total lack of contact to protect G.S. It appears she and her therapist started discussing how to deal with Father's visits—but again, she had not completed safety planning or relapse prevention, with or without accounting for his presence.

Finally, Mother's reliance on *In re Jasmine G.* (2000) 82 Cal.App.4th 282 is misplaced. There, the juvenile court removed a 15-year-old teenage girl due to corporal punishment, where a social worker opined the parents lacked a " 'full understanding' " of her "adolescent 'issues.' " (*Id.* at pp. 284-285.) The Court of Appeal reversed, stating the social worker's belief was not substantial evidence and there was evidence "it *was* safe to return," noting one therapist opined it was "totally safe" and the teenager "wanted to go home." (*Id.* at pp. 285, 288-289.) This case, in sharp contrast, involves an infant whose sister was abused nearly to death, and there was evidence from multiple sources, including Mother's therapist, that she was not yet ready to keep G.S. safe. Further, unlike the teenager, G.S. was too young to report abuse if it did happen again. (See *D.B.*, *supra*, 26 Cal.App.5th at pp. 332-333

13

[affirming removal of 18-month-old child; distinguishing *Jasmine G.* as "not comparable," noting child's parents "repeatedly physically abused the child's sibling" and a "15-year-old child may be able to protect herself against corporal punishment or call for help; an 18-month-old child cannot"].)[4]

### 2. *No Reasonable Alternatives*

The record also contains substantial evidence that there were no reasonable means to avoid removal. (§ 361, subd. (c)(1).) Mother contends the grandfather's "stipulated testimony demonstrates [a] sensible approach" to avoid removal. The grandfather indicated he could supervise "all contact" between Mother and G.S., and bar contact at night by keeping G.S. in a locked bedroom. Placement with Mother under these conditions would not have been consistent with the law, nor practical.

First, Mother does not establish the dependency law scheme provides for placing a minor with a parent whose custody entails a risk of harm, by subjecting the parent to constant supervision. Section 361 and related court rules contemplate that disposition orders short of removal may "limit the control to be exercised . . . by [the] parent," but do not provide for full-time supervision. (§ 361, subd. (a)(1); see Cal. Rules of Court, rule 5.695(a)(6), (b).) And courts have held that a child removed from a parent's custody cannot reside with the parent. (*Damonte A. v. Lenora B.* (1997) 57 Cal.App.4th 894, 896 [removal order allowing minors to stay with mother in "temporary placement" was invalid; statutes contemplate removal from the parents "will

---

[4] Mother also cites *In re James T.* (1987) 190 Cal.App.3d 58, 66, *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318, and *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1112 to emphasize removal must be supported by clear and convincing evidence and the burden of proof in the juvenile court is on the Agency. Those principles are not in dispute, but do not aid Mother here.

14

result in some *other* person or entity having physical custody" and "child will be placed in an appropriate home *other* than that of the parent"]; *In re Andres G.* (1998) 64 Cal.App.4th 476, 481 [reversing removal order placing minor with relative, but detaining him in parents' home; "Not only does such a procedure entail an unseemly inconsistency, its effect is to either remove children from the home under circumstances the Legislature did not authorize or to place children in a dangerous setting"].) A disposition order that placed G.S. with Mother under effectively full supervision would implicate the same incongruity, and the same risk, as a removal order permitting G.S. to live with her.

Second, the maternal grandfather's approach also is simply impractical. The grandparents essentially would have to supervise every interaction between Mother and G.S. during daytime hours, and stay in a locked bedroom with G.S. all night, which could pose its own logistical and safety concerns. (Cf. *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, 694 ["The very concept of monitored visitation is fundamentally incompatible with around-the-clock in-home contact that necessarily includes periods when the designated monitor will be unavailable to perform his or her protective function."].) Further, this approach would not resolve the Agency and juvenile court's concerns that Mother had not fully addressed the protective issue or crafted a plan for keeping G.S. safe from abuse in the future.

In her opening brief, Mother maintains there were "ways to . . . ensure" G.S.'s safety without removal, but identifies only the grandfather's stipulated testimony. On reply, she contends "additional . . . supervision by the agency itself in the form of normal activities like unscheduled home visits" would, along with family supervision, be sufficient to protect G.S., but cites no

15

evidence or authority.  We typically do not consider points raised for the first time on reply, or unsupported by authority.  (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)  We would reject the argument, regardless. Although social worker visits arguably could relieve some of the grandparents' supervision burden, they would not rectify the inconsistency of placing G.S. in Mother's care, when it remained unsafe to the point of requiring full-time supervision.

We conclude the juvenile court did not err in removing G.S. from Mother's custody.

DISPOSITION

The order is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

BUCHANAN, J.