Filed 1/16/24  In re I.S. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re I.S., a Person Coming Under the Juvenile Court Law. | B327642 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>S.B. et al.,<br><br>        Defendants and Appellants. | Los Angeles County<br>Super. Ct. No. 22LJJP00563A |

APPEAL from orders of the Superior Court of Los Angeles County.  Debra L. Gonzales, Commissioner.  Affirmed.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Appellant S.S.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant S.B.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

## SUMMARY

The juvenile court sustained jurisdictional allegations that the parents of baby girl I.S. were incapable of providing regular care for the baby without 24-hour assistance. The baby was born prematurely, with medical conditions related to prematurity that required special vigilance. Both parents have developmental delays. In its dispositional orders, the court removed the baby from custody of the parents and ordered reunification services, including a regional center assessment to determine what services and supports would be available to facilitate the parents' reunification with I.S. The court ordered the parents' participation in those services and supports once they were made available.

Mother appeals from the dispositional orders removing the baby from the parents' custody, and father challenges both the court's jurisdictional findings and the dispositional orders.

We affirm the orders.

## BACKGROUND

I.S. was born prematurely in October 2022 and placed in the neonatal intensive care unit (NICU). She was diagnosed with apnea of prematurity and related medical conditions, and remained hospitalized until December 24, 2022. A week before that, she had an apneic event during feeding and required vigorous stimulation. (In an apneic event, the baby turns blue and stops breathing.) Her last such event was on December 19 and required gentle stimulation to stabilize her vital signs.

The baby's NICU charge nurse (who was interviewed by a social worker on December 19) said the hospital would not discharge a baby unless the baby was no longer at risk for apnea of prematurity, but "clarified that they cannot guarantee that

2

this will not happen spontaneously at this time given the recent episodes." The nurse reported that babies tend to outgrow the condition on their own "and that this usually happens at term, about 36 weeks," and I.S. was reported to be corrected at 37 weeks. However, the medical team was "in unanimous agreement that they did not feel comfortable releasing the baby to the care of the parents without 24-hour supervision in the home."

The Los Angeles County Department of Children and Family Services (Department) was alerted to the family's circumstances on December 12, 2022, by a caller who was concerned about the baby's upcoming discharge and the parents' inability to absorb all the instruction necessary for the child's care. The baby had been weaned off oxygen, and had been weaned off her feeding tube within the last 24 hours. The baby's primary nurse reported her main concerns involved I.S.'s feeding and that the parents were not holding the baby properly or responding to her cues. Father continually held the baby in a manner restricting her air flow, and was not responsive to the nurse's redirection. The baby required feeding every four hours, but the parents were reluctant to wake her if she was asleep. The nurse reported it would be detrimental to the child's safety to go home with the parents "at the knowledge point that they are at right now as basic feeding and holding the child [in appropriate] manners are still not concepts that they have grasped."

At a discharge conference on December 14, 2022, the charge nurse reported that the volume of food the baby needed was two or three times greater than mother was able to provide during the parents' feedings. One of the doctors reported that

3

parents' lack of understanding of the urgent need of response during an apnea episode can lead to death.

The Department filed the dependency petition on December 20, 2022. On December 21, 2022, the juvenile court made its detention findings, and both jurisdictional and dispositional issues were set for hearing on February 15, 2023.

When I.S. was discharged from the hospital on December 24, 2022, she was placed with foster parents, who received training (including a baby CPR video and guided feeding sessions) at the hospital.

The Department's investigation preceding the detention hearing revealed other pertinent facts. The parents have their own mobile home where they have lived for many years, and the home was appropriate and well-prepared for a baby. The parents have a friend and neighbor across the street, a retired teacher, who provides them with transportation and who will do anything she can to support them so the family can remain together; she planned to "take a shift" and be there to take care of the baby in the afternoons. She takes a medication that makes her sleepy, but was adamant that she would be there when the family needed her. She has the means and time to help the parents as much as possible.

Mother is a client of a regional center. (Regional centers provide assessments and services for Californians with developmental disabilities.) The regional center worker on mother's case, Tynicia Coleman, reported that mother did not tell the center about her pregnancy, apparently because she was afraid the baby would be removed from her care.[1] Ms. Coleman

---

[1] In 2012, the parents in this case had another baby who was removed because of their inability to provide care and

4

indicated mother would qualify for several programs providing hands-on teaching and demonstrating. The Department's risk assessment concluded that, despite consultations with the regional center and others in efforts to arrange 24/7 support, that could not be done in the turnaround time required before the baby's discharge from the hospital.

On January 20, 2023, the Department's investigator interviewed father, mother, Ms. Coleman, and others. Father said the petition's allegations were false; the parents did nothing to hurt the baby and wanted a chance to show the Department they can take care of I.S.; they know when the baby is hungry and what to look out for; and he was holding the baby properly. Father said the parents have changed a lot since 2012 (when I.S.'s sibling was removed from their care; see fn. 1, *ante*). They have a stable home and income, as well as support from the neighbor, and they would accept the help of the regional center. Mother reported she set an alarm on her phone so she could be sure to feed the baby every four hours. Mother said she had talked to Ms. Coleman, who told her "they are going to get me some support here in the house."

Ms. Coleman told the investigator that if mother had told her about the pregnancy, she would have had services and supports set up before I.S. was born. At the time of the interview

---

supervision. Their parental rights were terminated, and the child was adopted. Here, the Department's dependency petition alleged the facts supported jurisdiction under both Welfare and Institutions Code section 300, subdivision (b) (failure to protect) and subdivision (j) (abuse of sibling). Because of substantial changes and improvements in the parents' circumstances during the intervening years, we focus only on the circumstances relevant to their care of I.S.

(January 20, 2023), Ms. Coleman was "still working on getting [mother] an updated Regional Center Assessment"; she was resolving an issue with the location of mother's file "so we can get her assessed to see what she needs so she can bring her baby home." Ms. Coleman identified several services for which mother would be eligible and could receive for as long as mother needed them. Ms. Coleman thought the parents were "very likely to be successful" with the right services in place; the services would "be very hands on"; and "[m]y only concern is that Mom is very high functioning and so she is able to handle many things on her own. I worry that she may need help and won't ask for help. We see that often with high functioning clients."

At the detention hearing, the court had ordered "as much monitored visitation as possible" after I.S.'s release from the hospital. On January 18, 2023, the child social worker talked to the Department's investigator after monitoring a visit, and reported she had no concerns about the parents' ability to care for the baby with the support of their neighbor and the regional center. She reiterated this view after a visit on January 25, 2023, stating the parents were very loving and attentive and that support from the regional center would be a good way to ensure child safety. At that visit, the baby's hand turned blue several times, and the parents noticed it and reported it immediately. The caregivers with whom I.S. was placed told the child social worker this also happened while the baby was in their care; they were told to "keep an eye on it" and make an appointment with a medical professional, which they did. When the Department's investigator met with the caregivers on January 20, 2023, they reported I.S. continues to "forget to breathe" while feeding, so they feed her one ounce at a time with breaks in between, but

there had been no episodes in which the baby stopped breathing while sleeping. On January 26, 2023, I.S.'s daycare provider reported I.S. was "doing great at her daycare."

At the February 15, 2023 jurisdictional and dispositional hearing, the Department and I.S.'s counsel emphasized their support for the parents' efforts to reunify with the baby, but argued removal was necessary at present, as parents did not have the resources and programs set up at their home. Both parents argued I.S. should be released to them "today." Father produced evidence he was already enrolled in parenting classes, and objected to regional center services for himself, arguing mother and child were already enrolled.

As stated at the outset, the court sustained the jurisdictional allegations, and found, by clear and convincing evidence, a substantial danger to the child if she were to be returned home, and no reasonable means to protect her physical health without removing her from the parents' custody.

Both parents filed timely appeals.

## DISCUSSION

Our responsibility on review of a jurisdictional order is to determine if substantial evidence, contradicted or uncontradicted, supports the findings. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) We review the evidence in the light most favorable to the juvenile court's order, drawing every reasonable inference and resolving all conflicts in favor of the prevailing party. (*Ibid.*)

We also review dispositional orders for substantial evidence. (*In re R.T., supra,* 3 Cal.5th at p. 633.) However, because dispositional orders require clear and convincing evidence, we ask whether the record as a whole contains substantial evidence from which a reasonable fact finder could

7

have found it highly probable that the fact at issue was true. (*In re V.L.* (2020) 54 Cal.App.5th 147, 149, 155.)

1. **The Jurisdictional Order**

Father argues the evidence we have recited does not explain either the nature of his alleged developmental delays or how those delays placed I.S. at substantial risk of serious physical harm or illness at the time of the jurisdictional hearing. While the nature of father's developmental delays is unknown on this record, the nexus between those delays and a substantial risk of harm to the baby was apparent from the reports and opinions of the baby's medical team in December 2022. (See pp. 3–4, *ante*.) For example, there was evidence that, at the hospital, father repeatedly held the baby in a way that restricted her airway, with the baby turning blue from lack of oxygen; father became defensive and was not responsive to the nurse's redirection.

Father points out the hospital would not discharge a baby unless the baby was no longer at risk of apnea; I.S. had had no episodes since her discharge; and the parents were reported to be very attentive and "very observant to the baby's safety and comfort" during their supervised visitation in January. But the hospital, despite the policy father cites, would not discharge the baby to the parents without 24-hour supervision in the home. And while parents had apparently made significant progress since the baby's discharge, the assessment of the Department's visitation monitor was that there were no concerns about their ability to care for the baby "*with support from the regional center*" (italics added), which had not been put into place at the time of the hearing. This evidence was sufficient to support jurisdiction.

## 2.    The Dispositional Order

A dependent child may not be taken from the physical custody of the parent "unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328; see also Welf. & Inst. Code, § 361, subd. (c)(1).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*D.B.,* at p. 328.)

Both parents contend the record shows no substantial danger to I.S.'s health or safety if she were returned home, and even if there were a substantial danger, there were reasonable means to protect her in her parents' home.

On the first point—no substantial danger to I.S.—the substance of the parents' arguments is that the hospital's concerns at the time of I.S.'s discharge (December 24, 2022) "were largely, if not completely, resolved" by the time of the hearing (February 15, 2023), and there was "no current information" to support a finding of substantial danger. We cannot agree.

Parents cite the evidence that I.S. had not had episodes in which she stopped breathing while sleeping since her discharge, and they were "appropriately attentive" to the baby during their supervised January 2023 visits. Parents overlook the facts that both the Department's visitation monitor and the regional center's case worker qualified their positive assessments of parents' ability to care for I.S. with the condition that there be supporting services in the home from the regional center. But

9

the necessary assessment by the regional center, which could have been done if mother had reported her pregnancy before the baby was born, had yet to be made. Moreover, father objected to regional center services for himself, and continued at his January 2023 interview to claim he did not hold I.S. in such a way as to restrict her airflow.

We conclude the record as a whole shows that a reasonable fact finder could have found it highly probable that a substantial danger to I.S.'s safety existed at the time of the hearing if she were returned home.

On the second point—whether there were reasonable means to protect I.S. short of removal—parents argue there was no discussion of any alternative plan for providing for I.S.'s safety in the home; nothing in the Department's report addressing efforts to avoid removal; and no reference by the court to any consideration of alternatives to removal. Parents say I.S. "could have been returned to Mother under strict supervision," and the court "could have ordered frequent unannounced home visits" to ensure I.S.'s safety, citing cases with very different facts.

Parents do not explain what they mean by "strict supervision" or how that is different from regional center support services, which were not in place at the time of the hearing, through no fault of the Department. We do not agree that I.S.'s safety could be assured by unannounced home visits, when there was evidence that parents needed ongoing support services in the home. Parents point to Ms. Coleman's evidence that they were likely to be successful "with the right services in place," and services "could be provided to Mother for the rest of her life if needed." But they fail to acknowledge that those services were *not* in place at the dispositional hearing. We conclude from this

record that it was "highly probable" removal was the only reasonable means then available to protect I.S.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional orders are affirmed.


GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.


VIRAMONTES, J.