Filed 7/19/23  In re Jason N. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JASON N., a Person Coming Under the Juvenile Court Law. | B320970 (Los Angeles County Super. Ct. No. 22CCJP00327B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JASON N., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hernan D. Vera, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Jason N. (father) appeals from an order of the juvenile court removing Jason N., Jr. (born November 2020), from his custody.[1]  Father contends Jason should have been placed with him, in the home of paternal grandmother (PGM), in New York under the supervision of the cooperating New York agency.  We find the evidence supports the juvenile court's finding that clear and convincing evidence existed of a substantial danger to Jason's health, safety, and protection if placed with father, and there were no reasonable means to protect the child without removal.  We affirm the order.

## COMBINED FACTUAL AND PROCEDURAL HISTORY
**Referral and initial investigation**

On January 23, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a call on the hotline alleging the children were in an unsafe situation, living in a tent in a homeless encampment on a median on a busy street in Venice, California.  A service provider tried to arrange services for Amanda K. (mother) and the children.[2]  Mother refused

---

[1]     Jason's half sibling Isabella (born April 2014) is part of this dependency proceeding but is not a subject of this appeal, as father is not Isabella's father.  Isabella is mentioned as needed. Jason and Isabella collectively will be referred to as the children.

[2]     Mother is not a party to this appeal.

assistance, including food and motel vouchers, and reacted aggressively towards the outreach provider, causing the service worker concern about the children sleeping in a tent in the cold weather. The children appeared dirty and malnourished. Mother was observed to have left the children outside the tent, leaving them unsupervised. Two other people in the camp reported that mother left the two children unattended "all the time."

In a second call to the DCFS hotline, the caller provided more information, including that mother and the children were from New York and recently arrived in California. Mother claimed to have left New York because she was not getting along with maternal grandmother (MGM) and due to domestic violence with father. Mother stated there was a protective order in place in New York.

A DCFS social worker made contact with mother at the encampment on January 23, 2022. There were approximately 20 tents on a median with lanes of traffic on either side. Mother insisted she was not homeless and that she had friends and family in the area, but could not provide any contact information. Mother became agitated and belligerent when the accompanying Los Angeles Police Department officer pointed out that Isabella was barefoot in the cold weather.

Mother claimed to be having issues with father, including him being mentally abusive and a drug dealer. She said there was a restraining order against him and an upcoming custody hearing in New York. Mother admitted she had been diagnosed with "Bi-Polar Schizo affected" but provided varying answers to whether she was taking medication. Mother admitted using marijuana but was unclear when she had last used the drug.

3

Jason was in a wet, dirty onesie without a diaper asleep in a stroller. His arms and legs were streaked with dirt and covered with sand. Isabella was also very dirty and unkempt and could not tell the social worker when she last had a bath. Isabella confirmed mother would leave her alone in the tent in charge of the baby. Isabella reported Jason's "daddy" was a bad man and who used drugs.

Mother stated father raped her in New York. Though she was uncertain he was Jason's father, she was hesitant to ask for a paternity test as she believed father knew people who could manipulate the results of such a test. Mother reported father was a drug addict and dealer and was "organized gang stalking" her. Mother added there had been involvement with child protective services (CPS) in New York but did not provide specifics. Mother admitted having been addicted to oxycodone following a car accident in the past. She completed a 30-day rehabilitation program, following an eight-day hospitalization, and occasionally used marijuana and alcohol.

The officers transported mother and the children to the police station, expressing concern about the children being in the encampment that was very dangerous. When mother was informed the children would be detained, she became angry and telephoned MGM, yelling that MGM had to come to California to get the kids.

The social worker spoke with MGM, who informed her that mother relocated to California as planned, and there was trouble with father, who had visitation. MGM confirmed mother had a history of mental health issues and was previously addicted to oxycodone, due to the fault of mother's doctors. MGM was uncertain if there was a CPS history in New York.

4

**Petition and detention**

On January 25, 2022, DCFS filed a Welfare and Institutions Code section 300[3] petition on behalf of the children, containing allegations of mother's neglect, failure to supervise the children and mental health issues. A first amended section 300 petition was later filed, which added counts regarding father's substance abuse and mother's failure to protect the children. The first amended petition alleged father had a history of substance abuse including Xanax and cocaine and was a current user of oxycodone, marijuana and cocaine, rendering him unable to provide regular care for the children. The petition alleged father's substance abuse endangered the children's physical health and safety and created a detrimental home environment, placing the children at risk of serious physical harm. On May 11, 2022, the juvenile court sustained this allegation.

In a last minute information for the court filed on January 28, 2022, DCFS reported a conversation between a local social worker and a Sullivan County New York CPS social worker, Jenesis Matos, on January 26, 2022. Matos reported the family had an open referral in New York but no court filing. There was a current family law proceeding pending, and father had monitored visitation with the children. Mother had a history of mental health issues, psychiatric hospitalizations, prescription drug abuse, and leaving the children unsupervised. Mother once told the authorities after leaving the children home alone that the pit bull dogs would guard them. Mother had previously lost custody of Isabella due to mental health issues and was not medication compliant. Father had a history of using and dealing

---

[3] All further statutory references are to the Welfare and Institutions Code.

drugs, but was attending a program and doing well. Father appeared to be genuinely trying to care for the children.

A second last minute information for the court filed on January 28, 2022, indicated father had contacted DCFS on January 25, 2022, and acknowledged having monitored visits twice per week. Father stated mother took the children out of New York without his permission. Mother had been leaving the children with him for days at a time despite her request for a restraining order. Father claimed mother's allegations in the restraining order were untrue. He denied being part of a gang or dealing drugs. Father confirmed mother's mental illness, recent hospitalizations and prior loss of custody of Isabella.

Father reported mother had picked up the children from his home on January 8, 2022, and was screaming in the streets that father was a drug dealer. Afterwards, mother got in a serious car accident with the children in the car. Mother's driver's license was suspended because she did not have insurance. Mother then went to a friend's home and rented a U-Haul. Father believed mother then left for California. Father had been looking for the children for two weeks before calling DCFS.

At the January 28, 2022 hearing, the juvenile court acknowledged possible jurisdictional issues under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.) and indicated it would contact the court in New York. The court found a prima facie showing had been made and ordered the children detained in foster care. It also found father to be the presumed father of Jason.

**Addendum report**

An addendum report was filed on February 16, 2022, regarding another conversation with CPS social worker Matos,

who stated there were concerns with father due to his substance abuse.  The family law judge ordered father to submit to a hair follicle test, and father subsequently shaved his head.  The displeased judge considered it a positive test.  The judge declined to grant father custody and ordered his visits be monitored.

At the most recent custody hearing, father was enrolled at an outpatient substance abuse program and had last tested positive on a drug test in November 2021.  Matos did not know for which drug.  Father told Matos the positive test was for "benzos," but Matos was unsure because she could not access the records.  Father also disclosed that he used to sell drugs.  Mother attended the same drug program but was terminated due to noncompliance.  Mother had been in touch with Matos after the children were detained in California and stated she was not planning on returning to New York.

Matos expressed belief that father could care for the children with support in place.  PGM was a support for father but was employed.  When the DCFS social worker informed Matos that father disclosed he had a prescription for oxycodone, Matos responded that she had not been informed of this and reiterated, "substance abuse has always been a concern."

DCFS interviewed father by telephone a second time on February 15, 2022.  Father had a medical marijuana card and disclosed use of marijuana one or twice a week for PTSD, anxiety, and pain in his knees, hands, back, and disc.  Father claimed the pain was due to physical work.  He admitted a criminal history, which included a 2013 possession of cocaine with intent to sell.  He completed a treatment program and a five-year probation.  Father was also arrested in 2018 when he was in a car with mother that was pulled over due to a warrant for mother

concerning car theft. Father stated he loved mother and "took the charge" for the marijuana found in the car.

Other than marijuana, father admitted he was "caught up with Xanax" when he was younger and still attended a support group. Father stated he was currently attending a drug program because of family court.

Father denied being verbally abusive or violent with mother. He admitted there was a protective order allowing him supervised visitation, but claimed mother "didn't care unless I did something she didn't like." Father had no contact with mother and did not seek contact; he wanted to have the children placed with him in New York. Father said his brother and sister-in-law were also willing to care for the children.

Father acknowledged if he were to drug test that day he would test positive for marijuana and oxycodone, which had been prescribed for sleep, though he was tapering off oxycodone on a "step-down" method. He offered to provide medical records if needed. Father was in a treatment program he had started the previous August or September, pursuant to an order by the family law court, and was tested for drugs by a weekly mouth swab.

Father later provided copies of his oxycodone prescription and medical marijuana card.

The children remained placed in a foster home.

The scheduled February 24, 2022 hearing was continued for the UCCJEA issue to be addressed.

**Jurisdiction/disposition report and additional reports**

The March 15, 2022 jurisdiction/disposition report included additional interviews with mother and extended family.

Mother continued to question father's paternity, did not want the children to return to New York, and did not want

8

Isabella to have telephone contact with father as he was not her biological father. She maintained father was abusive and a drug dealer.

Maternal aunt, Ashley H., who lived in New York, expressed concern about the children being placed with father and described the paternal family as unsafe. She wished to have the children placed with her.

PGM was interviewed. She too wanted the children placed with her. She confirmed father lived with her intermittently and claimed mother made false allegations against her.

In a March 15, 2022 addendum report, DCFS provided a February 28, 2022 e-mail from father's case manager at his drug treatment program reflecting that father had been enrolled in the treatment program since September 16, 2021; father had prescriptions for oxycodone and marijuana; he tested positive for cocaine on January 27, 2022, and had otherwise tested negative for that drug; father consistently tested positive for marijuana, opiates, oxycodone, noroxycodone, and oxymorphone; and father was compliant with treatment and focused on regaining custody of his son.

Mother reiterated father was abusive. She stated she had entered the same treatment program as father, but he was "harassing" and "abusive" towards her and made false allegations against her. Mother ended their relationship in July or December 2021 because it was toxic. Mother stated father yelled and behaved irrationally.[4]

---

[4] The March 15, 2022 jurisdiction/disposition report indicated DCFS had not yet completed its investigation into Jason's family heritage for the purposes of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and California's equivalent law (Welf. & Inst. Code, § 224 et seq.).

In a March 24, 2022 last minute information for the court, father provided DCFS with documents from the family law case, including a court order that Jason not be permanently removed from New York while the disposition of the case was pending and requiring mother to provide legal proof of paternity.

A May 11, 2022 last minute information for the court reflected father's expression of frustration that the foster mother was making it difficult for him to have his phone calls with Jason by not complying with the written schedule.

Father provided updated medical records, showing that he was being seen for sleep apnea and lumbar disc disorder. Father was on a low dose of Percocet for pain and had no side effects. Father also submitted a December 27, 2021 certificate for completion of parenting classes. A May 10, 2022 letter from father's case manager at his treatment program reported father was compliant with the program's rules, attending required sessions and submitting to random weekly drug tests. Father was re-assessing his past destructive behaviors and was focused on healthy goals to make positive changes. Father had tested negative for all mood altering substances within the past 90 days. Father's anticipated completion date for the program was June 2022.

DCFS recommended against placing Jason with father due to father's use of prescription medication and history of substance abuse. DCFS also expressed concern that parents had a history of domestic violence, which they had failed to address.

**Adjudication and disposition**

At the May 11, 2022 adjudication, the juvenile court informed the parties the New York court was declining jurisdiction. Father and mother appeared via Webex and were

10

represented by counsel. Mother pled no contest. After hearing argument, the juvenile court sustained the amended petition.

Prior to the disposition hearing, DCFS provided a last minute information for the court indicating it was not recommending that Jason be released to the care of father. DCFS stated father "has a long-term substance abuse issue and prior treatment and services failed to ameliorate his substance abuse issues." DCFS noted that even while attending treatment, father continued to test positive for cocaine, opiates, and marijuana.

At the May 25, 2022 disposition hearing, the juvenile court heard testimony from mother, Isabella's father, and father. Mother reiterated her concerns about Jason being placed with father.

Father testified that he lived with Jason and mother for the first two and a half months after Jason was born. Mother was then hospitalized several times, and father had Jason during those periods. Father stated his visitation was monitored as ordered by a restraining order, and PGM and paternal grandfather monitored his visits. However, what was ordered for visitation was not always what was followed; it was dependent on what mother wanted, including father having the children overnight. Father stated he was able to have Jason in his home and was willing to have Isabella placed with him as well. Father did not want Jason placed with Ashley H. because Isabella had previously lived with her and was not treated well.

Father's counsel argued Jason and Isabella should be placed in father's care, or alternatively placement with father's brother should be ordered. Jason's counsel joined DCFS in asking that the child not be placed with either parent at that time.

11

The juvenile court declared Jason a dependent of the court, removing him from the custody of father based on father's substance abuse. He was also removed from mother's custody. Jason was ordered suitably placed. The court also ordered family reunification services and monitored visitation with Jason for father. Assessments of the homes of maternal aunt and paternal uncle and his wife were ordered.

Father filed a timely notice of appeal.

## DISCUSSION

### I.    Applicable law and standard of review

Section 361, subdivision (c)(1) permits the juvenile court to remove a child from the physical custody of his parents if the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate

12

court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) In conducting our review, we must "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011-1012.)

## II. Substantial evidence supported the juvenile court's decision that there existed a substantial danger to Jason if placed in father's custody

Father is not challenging the jurisdictional findings in this case, which included allegations that father has a history of substance abuse, including Xanax and cocaine, and is a current abuser of oxycodone, marijuana and cocaine, rendering father incapable of caring for the child. However, father challenges the juvenile court's dispositional order removing Jason from his custody.[5]

Substantial evidence supports the juvenile court's decision that returning Jason to father's custody would create a

---

[5] Father cites *In re James T.* (1987) 190 Cal.App.3d 58 as an example of a case in which a jurisdictional order was affirmed but the dispositional order reversed. Father highlights language in the case suggesting that section 361 "embodies legislative solicitude for parental rights." (*James T.*, at p. 66.) The *James T.* court found the facts of that case fell "far short of the statutorily defined cases justifying state intervention to sever, if even temporarily, the parent-child relationship." (*Id.* at p. 65.) As set forth below, the present matter is factually distinguishable, and the evidence before the juvenile court here supports the removal order.

13

substantial risk of harm to the child.  Father has a long-standing substance abuse history.  He admitted being "caught up with Xanax" when he was younger and, despite attending a group for that drug use, continued to use drugs.  Father has a criminal history that included a 2013 possession with intent to sell cocaine, for which he completed a treatment program and five-year probation.  Despite completing those programs, he was arrested in 2018 after law enforcement found marijuana in a car where mother and father were present.  As recently as January 2022, father tested positive for cocaine—the same drug involved in his 2013 arrest.  Father continues to use marijuana and oxycodone to address pain despite his history of drug use and treatment.  The New York CPS social worker indicated "substance abuse has always been a concern" with father.  This history shows that despite various treatments, father continued to engage in drug use.  Given father's long history of drug use, and continuing use of drugs, the juvenile court did not err in determining that there was a substantial risk to Jason if placed in father's care.

Father argues that he was participating in a substance abuse treatment program at the time of the proceedings and was compliant with the program.  However, father had previously completed drug treatment programs and, despite completing those programs, continued to use drugs.  Father also argues that he lives with PGM and was able to receive Jason at the home of PGM.  Father has cared for Jason without mother's help when mother was subjected to multiple psychiatric hospitalizations.  After mother sought a restraining order against him, father continued to have monitored visits with the children.  However, father states he cared for the children anytime mother wanted him to, including overnight visits.

Father's history of caring for the children does not undermine the juvenile court's finding that father's drug use placed Jason at substantial risk for future harm. "'The court need not wait until a child is seriously abused or injured to . . . take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Given father's long history of substance abuse and his failure to overcome the problem through various treatments, the juvenile court did not err in finding a substantial risk to Jason if placed in father's custody.

Father cites *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288-289 (*Jasmine G.*), as an example of a case in which the evidence supporting a removal order was too speculative to support such action. *Jasmine G.* involved corporal punishment of a teenager by parents who were "employed, 'law-abiding citizens' with no alcohol or drug dependencies and no prior encounters with the juvenile dependency system." (*Id.* at p. 285.) In reversing the juvenile court's decision not to return the child to her parents, the *Jasmine G.* court noted, "The case before us is remarkable for the clear and convincing evidence that it *was* safe to return Jasmine to either of her parent's homes." (*Id.* at p. 288.) Specifically, both parents had "forsworn corporal punishment of teenagers. Both expressed remorse for having used corporal punishment on Jasmine. Both had attended parenting classes, and both had undergone therapy to improve their parenting skills. Jasmine had no fear of either." (*Id.* at pp. 288-289.) In fact, "Jasmine herself wanted to go home." (*Id.* at p. 289.)

The present matter is distinguishable. Father's criminal history and admitted history of drug use create a substantial risk of harm to Jason, who is not a teenager but a child of tender years. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219

15

[children six years old or younger are considered children of "'tender years'"].) In dependency law, when a child of tender years is involved, a finding of substance abuse "'is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.'" (*Ibid.*) Father has not challenged the jurisdictional finding that his drug use places Jason at substantial risk of harm. Further, unlike the parents in *Jasmine G.*, father has not shown he has acknowledged and overcome the issues leading to Jason's dependency.

## DISPOSITION

The order is affirmed.

_____
CHAVEZ, J.

We concur:


_____
ASHMANN-GERST, Acting P. J.


_____
HOFFSTADT, J.

16