Filed 8/10/23  In re A.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E080027 |
| Plaintiff and Respondent, | (Super. Ct. No. RIJ2200454) |
| v. | OPINION |
| J.R. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge. Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant J.R.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant C.R.

No appearance for Plaintiff and Respondent.

1

Neale B. Gold, under appointment by the Court of Appeal, for Minors.

## I.

## INTRODUCTION

J.R. and C.R. are the adoptive parents/paternal grandparents of 16-year-old Ar.R. (Ar.), 15-year-old L.R. (L.), 13-year-old Ab.R. (Ab.), and 10-year-old J.R. (J.)[1] The adoptive parents appeal a dispositional order entered in a juvenile dependency proceeding removing J. from their custody pursuant to Welfare and Institutions Code[2] section 361, subdivision (c)(1). On appeal, the adoptive parents argue there is insufficient evidence to support the juvenile court's dispositional order removing J. from their custody. We disagree and affirm the order.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

The children were adopted by their paternal grandparents, and they are the legal parents of the children. Grandmother/adoptive mother is C.R. (Adoptive Mother), and grandfather/adoptive father is J.R. (Adoptive Father) The biological father is their son, C.N.[3] The biological mother is S.M.

---

[1] Only J.R. is the subject of this appeal.

[2] All future statutory references are to the Welfare and Institutions Code.

[3] At times, the biological father is referred to as the adoptive adult sibling in the record. The biological parents are not parties to this appeal.

In February 2022, the Riverside County Department of Public Social Services (DPSS) received a referral alleging general neglect of the children by Adoptive Mother. There were allegations that L. and Ar. smoked marijuana in the home and that Ar. smelled of marijuana when she went to school. In May 2022, DPSS received another referral alleging physical abuse of Ar. by biological father C.N. and general neglect by the adoptive parents. Ar. disclosed that C.N. lived in the home and that when she misbehaved C.N. physically abused her. Following the last incident in which C.N. hit Ar. with a belt multiple times on her buttocks, Ar. ran away from the home as she was afraid C.N. would continue to physically abuse her. Biological mother S.M. filed a missing person report on May 25, 2022, when Ar. did not return for two days. There were also allegations that C.N. had physically assaulted Adoptive Father, that C.N. smoked substances, and that Adoptive Father drank "'a lot'" of alcohol in the home. In addition, there was an active restraining order preventing C.N. from having any contact with the children or the adoptive parents. C.N. also had a pending criminal matter related to his assault of an Ontario police officer that occurred in July 2021. There were also subsequent referrals alleging sexual abuse of Ar. and L. by C.N., and that C.N. had given Ar. and L. marijuana to smoke.

L. reported that she was previously sexually assaulted by an adult brother. The adult brother had a conviction for sexually assaulting L. and Ar. and stayed at the adoptive parents' home at times, even though he made the girls uncomfortable. L. noted that she would not tell Adoptive Mother about feeling uncomfortable because she

3

believed C.N. would physically hurt someone. She also feared the disclosure of the inappropriate contact by the adult brother would disrupt the family. L. disclosed being hit with a belt by C.N. after he found a vape pen in the girls' bedroom. Both Ar. and L. sustained bruising as a result of being hit with the belt. L. noted that her buttocks felt numb and that it hurt to sit down. J. denied knowledge of drugs used in the home or anyone acting under the influence. He was also not aware of how Ar. was disciplined because the adults would tell him to go to his bedroom when she was being disciplined. J., however, disclosed that Ar. cries in her bedroom after she is disciplined.

Adoptive Mother acknowledged that C.N. disciplined the children. C.N. admitted to hitting Ar. and L. with a belt after finding drug paraphernalia in the girls' bedroom. The adoptive parents and C.N. acknowledged that C.N. lived in the home. They also admitted that C.N. had an active restraining order preventing him from having contact with the children or the adoptive parents. The adoptive parents, however, wanted to request the dismissal of the restraining order. They also wanted C.N. to be in the home to assist with disciplining the children. DPSS was concerned that C.N. was allowed to live in the home with the children in violation of the restraining order and that the adoptive parents left the children unsupervised with C.N. and allowed him to physically discipline the children.

In June 2022, Ar. obtained a lawyer and petitioned to not remain with the adoptive parents due to her fear of them allowing C.N. to physically abuse her and to live in the home. She was staying with her biological mother pending the hearing. Ar. noted that in

4

April 2022, Adoptive Father gave C.N. permission to hit Ar. and L. with a belt. Forensic interviews regarding the allegations confirmed that C.N. had used a belt on the girls to hit them, causing them to sustain bruising. And although DPSS had set up a safety plan, Adoptive Mother confirmed that she had allowed L. to have phone contact with C.N.

On June 21, 2022, DPSS filed a petition on behalf of the children pursuant to section 300. A first amended petition was filed on September 28, 2022, pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of sibling).

The detention hearing was held on June 22, 2022. The juvenile court formally detained the children from the adoptive parents. Minors' counsel was in agreement with J. being placed with his paternal aunt and was eventually placed in her home.

DPSS's further investigation revealed that the adoptive parents had an extensive child welfare history. Adoptive Mother was associated with 51 prior child welfare referrals, and Adoptive Father with 25 prior child welfare referrals. The children, Ar., L., Ab., and J., were involved with 31 referrals since their adoption was finalized in 2015, and DPSS had received 16 referrals in 36 months and eight referrals in 12 months.

When interviewed again, Ar. stated that C.N. had slapped her on the face and hit her with a belt. She had sustained two bruises on her buttocks and one on her lower back. She had informed Adoptive Mother about C.N.'s physical abuse, but Adoptive Mother failed to do anything. C.N. said he would give "them" as many bruises as he wanted. Ar. also stated that C.N. had showed them his sexual parts and that their adult brother had

5

sexually abused L. and Ab. Ar. had informed her biological mother about an incident where C.N. had showed his penis to Ar. and L. Biological mother specifically stated that Ar. had informed her that C.N. took them into the restroom and told them he was going to show them how a woman keeps their vagina clean. He then showed them his penis, including "'the head and veins of the penis.'" Ar. also reported that when C.N. searched her and L., he would search too close to their private part and that he made them watch videos of him and his previous partners having sex. Ar. further said that she had smoked weed with C.N. When asked regarding J. being at risk of suffering similar harm, Ar. stated, "'If my dad [C.N.] wouldn't be around this wouldn't happen again.'"

L. again indicated that C.N. had hit her several times with a belt and that she had sustained bruising. She noted that although her adoptive mother looked sad and said she did not give C.N. permission to hit them, Adoptive Mother also did not stop him. L. confirmed being sexually abused by her adult sibling, but noted her adoptive parents did not allow him back in the home. She noted smoking weed with C.N. when she was 12 or 13 years old, and the adoptive parents telling them multiple times to not do drugs. They, however, continued to use drugs. L. denied being sexually abused by C.N. She noted feeling safe in her adoptive parents' home and did not believe J. was at risk of harm in their home.

Ab. stated that her adult brother C.J. had sexually abused her when she was three or four and that Adoptive Mother had called the police. She denied sexual abuse by C.N., but confirmed that her sisters and C.N. smoked marijuana. At that time, Ab. stated that

6

she felt safe with the adoptive parents. J. denied being physically disciplined by C.N. and denied knowledge of physical abuse in the home or witnessing Ar. or L. being disciplined. He also denied sexual abuse or knowledge of it in the home. J. stated that he felt safe and protected in the home and denied any concerns. He wanted to go back with the adoptive parents. Adoptive Father admitted C.N. had hit the children with a belt. The adoptive parents were glad that J. was placed with family.

DPSS believed out of home placement was necessary and the only protective intervention possible for the children. DPSS was concerned about the adoptive parents' capacity to protect the children, the allegations of physical and sexual abuse, the failure to protect the children from C.N. and the adult sibling, and C.N. giving Ar. and L. marijuana to smoke. DPSS was also concerned that Ar. and L. smoked weed in the home with her younger siblings present and that the adoptive parents telling C.N. when Ar. misbehaved, despite knowledge of him physically abusing her. DPSS confirmed that there was a restraining order protecting the children and the adoptive parents from C.N. and that it remained active.

DPSS was also concerned about Ar.'s behavior and disregard that her choices influenced her younger siblings, including J., and placed them in potentially harmful situations. DPSS did not believe it was a good idea to have the younger children return home with the adoptive parents, noting J. required a stable home environment. DPSS explained that the adoptive parents had failed to protect the children from C.N. They had

7

violated a known restraining order. They had allowed C.N. in the home, accessible to the children. And they had knowingly used C.N. to inappropriately discipline the children.

DPSS later changed its recommendation for the younger children, which included J. By August 2022, DPSS recommended that the younger children return to the adoptive parents' home with family maintenance services.

In September 2022, DPSS reported ongoing incidents with Ar.'s high-risk behavior and disregard for the choices she made, which gravely influenced her younger siblings and placed them in potentially harmful situations. DPSS was concerned about the long-term effects of Ar.'s risky behavior on her younger siblings, noting J. being exposed to such circumstances at such a young age could lead him to model similar behavior. DPSS reported that it could be detrimental to progress J. back home due to Ar.'s high-risk behaviors.

By October 2022, Ab. no longer felt safe with the adoptive parents. She was worried C.N. would sneak back into the home. DPSS noted that Adoptive Mother was engaged in counseling and couples' therapy. DPSS believed it was still detrimental to progress the younger children back to the adoptive parents' home.

The contested jurisdiction/disposition hearing was held on October 13, 2022. At that time, DPSS again changed its recommendation and asked J. to be returned to the home of his adoptive parents with family maintenance services. Minors' counsel disagreed with returning any of the children to the adoptive parents care and custody. Following lengthy argument by the parties, the juvenile court sustained the first amended

8

petition and declared J. a dependent of the court pursuant to section 300, subdivision (j).[4] The court explained its reasoning as follows: ". . . there is a substantial risk the child will be abused . . . in light of the fact that . . . the adoptive parents, have violated the safety plan not once, but at least twice, in light of the fact that they allowed [C.N.] to be present, in light of the fact that they allowed [C.N.] to use corporal punishment on the older two girls. [¶] It appears almost as if the reason J[.] has not or did not suffer the same abuse was because of his age. . . . So at this point, the Court is going to find (j)(1) to be true."

The juvenile court thereafter removed J. and his sisters from parental custody and provided the adoptive parents with reunification services and supervised visits twice a week with discretion to liberalize the visitations. The court expressed its disagreement with DPSS regarding J.'s return to parental custody, noting: ". . . the Court is not going to go with [DPSS's] recommendation. It is not appropriate to return either J[.] or Ab[.] because, again, there is inconsistency in the recommendation to the adoptive parents at this time." The court found no reasonable alternatives to removal of J. from the adoptive parents and noted there were significant issues in this case. The adoptive parents timely appealed.

---

[4] The court also declared J.'s older sisters (Ar., L. and Ab.) dependents of the court, modified some of the allegations and struck some of the allegations pertaining to J.'s siblings.

III.

DISCUSSION

Adoptive Mother argues that there was insufficient evidence to remove J. from her physical custody.  She contends J. was not at risk of physical or sexual abuse and that there was no substantial danger or risk to J. in her custody.  She further asserts there were reasonable alternatives to J.'s removal the court could have implemented.  Adoptive Father joins in the arguments presented by Adoptive Mother.

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing.  [Citation.]  At the dispositional hearing, the court must decide where the child will live while under the court's supervision."  (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.'"  (*Id*. at pp. 169-170.)  At the dispositional stage, the court may consider a parent's past conduct, present circumstances, and response to the conditions giving rise to the dependency proceedings.  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

To support an order removing a child from parental custody, the juvenile court must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the

10

minor's parent's . . . physical custody." (§ 361, subd. (c)(1); see *In re Henry V.* (2004) 119 Cal.App.4th 522, 525 ["A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature."].) The court must also determine "whether reasonable efforts were made to prevent or eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) "The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.)

The heightened burden of proof for removal reflects a legislative effort to keep children in their homes with their parents when it is safe to do so. (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288.) "'By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the "bias of the controlling statute is on family preservation, not removal."'" (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115.)

We review a dispositional order removing a child from a parent for substantial evidence, "'keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence.'" (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) "[A]ppellate review of the sufficiency of the evidence in support of a finding

11

requiring clear and convincing proof must account for the level of confidence this standard demands." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) In applying this standard of review, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995-996.) "Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. We draw all legitimate and reasonable inferences in support of the judgment. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders. [Citation.]" (*In re D.B.* (2018) 26 Cal.App.5th 320, 328-329 (*D.B.*).)

Adoptive Mother argues while there is sufficient evidence to support the juvenile court's jurisdictional findings with respect to J., the evidence is insufficient to meet the heightened standard to support the court's removal order because there was no evidence J. had been neglected or abused while in Adoptive Mother's custody. She further notes that there was insubstantial evidence he indirectly experienced or witnessed any form of abuse and that J. felt "protected and safe" in Adoptive Mother's care.

Pursuant to section 361, subdivision (c)(1), the juvenile court was tasked with determining whether "[t]here is or would be a substantial danger" to J. if he was returned to Adoptive Mother and Adoptive Father's custody. The court found by clear and convincing evidence that such danger existed based on the adoptive parents having

12

violated the safety plan at least twice, allowing biological father C.N. to be present in their home, and allowing biological father C.N. to use corporal punishment on the older two girls.

We conclude there was substantial evidence here to support the juvenile court's dispositional order. Adoptive Mother and Adoptive Father do not dispute that Ar. and L. were physically abused by C.N. or that they had allowed C.N. to discipline the children. They also do not dispute that they had allowed C.N. to live in their home, despite the restraining order protecting the children and them from C.N. C.N. admitted to hitting the girls with a belt, causing them to sustain bruising, as a form of discipline. In fact, he said he was going to give them as many bruises as he wanted. By October 2022, Ab. no longer felt safe with the adoptive parents and was worried C.N. would sneak back into the home. Neither Adoptive Father nor Adoptive Mother did anything to stop C.N.'s abuse of the girls. They never told C.N. to leave the home or report the abuse to authorities. Rather, they allowed C.N. to reside in the home with the children, despite the restraining order. They had also allowed the adult brother who had sexually abused the girls to stay in the home at times, even though he made the girls feel uncomfortable. And due to fear, the girls did not report how the adult brother made them feel when he stayed in the home.

J. denied knowing how Ar. was disciplined and was told to go to his room while C.N. disciplined the girls. Although J. denied knowledge of physical abuse in the home, he noted that he would hear Ar. cry in her room after she was disciplined. Hence, he

13

indirectly was aware of the abuse. In addition, C.N. had no qualms about physically harming the children as a form of discipline, and J. was not protected simply because of his age and gender. C.N. had not only physically abused J.'s older sisters, but had also physically assaulted Adoptive Father and a police officer. Moreover, the adoptive parents had an extensive child welfare history. Adoptive Mother was associated with 51 and Adoptive Father with 25 prior child welfare referrals. The children were involved with 31 referrals since their adoption was finalized in 2015.

While it is commendable Adoptive Mother had begun her services, substantial evidence shows the adoptive parents were unable to protect J. and his siblings, thereby placing J. at a substantial risk of harm. (See *D.B.*, *supra*, 26 Cal.App.5th at p. 333 [substantial evidence supported removal order based on physical abuse to sibling, where juvenile court found "parents had made 'some progress' and . . . gained 'some insight,'" but "'it was just too soon,'" citing the severity of the abuse and parents' credibility issues].) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*D.B.*, *supra*, 26 Cal.App.5th at p. 328.) The court may consider the parent's past conduct as well as present circumstances. (*Id*. at p. 332, citing *In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917.)

Mother relies on *In re Hailey T.* (2012) 212 Cal.App.4th 139, in which the Court of Appeal reversed the dispositional order removing a four-year-old minor from her parents' custody after her infant sibling was found with a nonaccidental injury to one eye.

14

(*Id*. at p. 145.)  In *Hailey T*., there was disputed expert testimony regarding whether the eye injury was inflicted by the parents or could have been caused by the minor.  (*Id*. at p. 148.)  Additionally, there was no evidence the minor was ever physically harmed in the parents' home or had suffered harm because of the abuse to her sibling.  (*Id*. at pp. 147-148.)  There was also evidence to show the minor would have been capable of reporting any abuse, since she possessed good language skills, and was outgoing and social.  (*Id*. at p. 147.)  The appellate court also noted that the parents had a "healthy relationship," as there was no evidence of any domestic violence between them, and neither parent had any mental health or other issues that would put the minor at a continuing risk.  (*Ibid*.)  The appellate court concluded that although the record supported the court's jurisdictional findings, the record was insufficient to show a substantial risk of harm to the minor if not removed from her parents' custody under the clear and convincing standard of proof.  (*Id*. at p. 148.)

We are not persuaded that *Hailey T*. requires reversal of the juvenile court's dispositional order in this case.  Unlike the eye injury that gave rise to the dependency proceedings in *Hailey T*., the abuse to J.'s sibling was not an isolated incident.  Rather, C.N. had physically abused J.'s sisters multiple times, causing them to sustain bruising, and claimed he would give them as many bruises as he wanted.  And the adoptive parents acquiesced in the physical discipline of the girls and appeared powerless to stop C.N.'s abuse.  In fact, they had allowed C.N. to live in the home, despite the restraining order.

15

Further, in contrast with the dueling expert testimony presented in *Hailey T.*, the record in this case of the physical abuse to J.'s sisters was undisputed.

Likewise, Adoptive Mother's reliance on *In re A.E.* (2014) 228 Cal.App.4th 820 is also misplaced. The facts in that case are distinguishable. In *In re A.E.*, the appellate court found the juvenile court erred by removing a three-year-old girl from her father's custody based on one occasion of discipline where he spanked her with a belt on the legs and buttocks. (*Id.* at pp. 822, 826-827.) The court emphasized the father was remorseful, committed to learning better discipline methods, had no history with the social services agency, and no criminal record. (*Id.* at pp. 822, 826.)

Here, unlike in *In re A.E.*, *supra*, 228 Cal.App.4th 820 the physical abuse by C.N. was not an isolated incident but ongoing and likely to recur. C.N. never expressed remorse, but stated he would give as many bruises as he wanted to give his children. The adoptive parents gave no credible reassurance they could and would protect the children. In fact, they had violated safety plans implemented by DPSS. In addition, the adoptive parents had 31 child protective service referrals involving the children. The future risk to J. in this case was high in contrast to *In re A.E.*

The record also contains substantial evidence that there were no reasonable means to avoid removal. (§ 361, subd. (c)(1).) The adoptive parents claim there were reasonable alternatives to removal such as implementing "a reasonable safety plan." However, as previously noted and as the juvenile court found, the adoptive parents had violated prior safety plans that had been implemented by DPSS to keep C.N. away from

the children at least twice. They had also violated the court-ordered restraining order by allowing C.N. to have contact with the children, allowing C.N. to reside in the home, allowing C.N. to physically abuse the children, and assenting to C.N.'s abuse of the girls. Adoptive Mother had also allowed C.N. to have phone contact with L. As the juvenile court determined, there were no orders that could have been made to prevent J.'s removal, noting there were significant issues in this case. Substantial evidence supported the court's conclusion that there were no reasonable means to protect the children without removing them from the adoptive parents' custody. (§ 361, subd. (d); *D.B.*, *supra*, 26 Cal.App.5th at p. 332.)

## IV.

## DISPOSITION

The order removing J. from his adoptive parents is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

17