Filed 10/22/25  In re Z.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re Z.P., a Person Coming Under the Juvenile Court Law. | D086156 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J521575) |
| Plaintiff and Respondent, | |
| v. | |
| K.P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

David J. Smith, Acting County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

After the juvenile court asserted jurisdiction over six-year-old Z.P., it removed Z.P. from her mother K.P. (Mother) and placed Z.P. with the presumed father. Mother does not challenge jurisdiction. Her sole contention on appeal is that the juvenile court abused its discretion by finding there were no reasonable means to prevent removal of Z.P. from Mother, including placement with Mother on the condition that Mother live in the maternal grandmother's home. Finding no abuse, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Circumstances Leading to the Dependency Petition*

Mother had an on-and-off relationship with the presumed father (Father). They have one child, Z.P., born in October 2018. Mother and Father got back together for a time after Z.P. was born and lived in the home of Father's parents. When they separated in May or June 2024, Mother and Z.P. moved to maternal grandmother's house (Grandmother).

Starting in 2022, the San Diego County Health and Human Services Agency (the Agency) began receiving referrals alleging neglect, abuse, or emotional abuse of Z.P. by Mother or Father. After finding early claims inconclusive, in June 2023, the Agency substantiated a general neglect allegation by both parents due to their use of alcohol and verbal arguments. Relatives reportedly moved Z.P. to another room when these interactions occurred. Then three-year-old Z.P. said she felt "mad" when her parents argued. The Agency received but did not substantiate additional referrals in 2024 for neglect over Mother's daily alcohol use, physical altercations between the parents, Father's drug use, and Mother's mental health.

2

In July 2024, the Agency substantiated a referral for general neglect of Z.P. when Mother drank alcohol and physically attacked Grandmother in Grandmother's home. Grandmother called the police and initiated a Welfare and Institutions Code[1] section 5150 hold on Mother.

Concerning this incident, Mother told the Agency that when Father violated the visitation arrangement by not bringing Z.P. back to her on time, Mother "lost it," got depressed, relapsed on alcohol, and "went into psychosis." When the section 5150 hold was released, Mother asked Father to pick her up from the hospital, and Mother and Z.P. spent three days in Father's home. During that time Mother said Father threw a sandal at her face when Z.P. was present, causing swelling to Mother's eye. Mother left Father's house the following day, but Father followed them to Grandmother's house and banged on the door. They called the police and Father was arrested. Z.P., then five years old, told the Agency, "[m]y daddy always fights with my mommy" every time they were together "but not on my birthday." She felt "very sad" and yelled at her parents to stop arguing but they did not listen to her.

While the July 2024 referral was pending, the Agency received another referral. In August, Mother reported Father grabbed her and threw her to the ground during an argument at the park. Mother walked away and saw Father and Z.P. get in the car. She assumed Father was going to leave her at the park, so Mother got into the car. She and Father continued arguing while Z.P. sat in the backseat of the car. Father drove to a trolley station and tried to push Mother out of the car.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code. Section 5150 allows a peace officer to detain an individual for up to 72 hours, upon probable cause that the person is a danger to themself or others. (§ 5150.)

3

Father told the Agency that Mother suggested they all visit a park. Father drove them all to the park, and after they arrived, Mother kicked the car while he and Z.P. were inside the car. Father tried to drive away with Z.P., but Z.P. asked him to stop because Mother was yelling outside the car. Mother got into the car and kept kicking the inside of the car. Mother slapped Father and threw a drink at him. Mother grabbed Z.P.'s earmuffs and scratched Z.P.'s hand. Father provided a video showing Mother kicking the vehicle and Z.P. crying and screaming in the background. When shown this video, Mother blamed Father and said Father purposely upset her so she would react that way.

Z.P. said Mother got mad when Father broke Mother's bracelet. Z.P. cried as she saw Mother slap Father on the cheek and throw a drink at him. Mother kicked the front and side of the car. Mother scratched Z.P. when Mother took Z.P.'s earmuffs. Z.P. felt sad and mad and put her thumb down when the social worker asked if she felt safe around her parents.

The Agency substantiated allegations of general neglect by Mother and Father for the July and August 2024 incidents, and emotional abuse by Mother for the August incident.

In August 2024, each parent obtained a restraining order against each other.

In September 2024, the Agency opened a voluntary services case with Mother and Father to "stabilize the family at the lowest level of intervention." The parents met regularly with the Agency, implemented a safety plan, and Mother and Father each agreed to a voluntary services case plan.

In November 2024, Z.P. reported she and her parents went to Sea World together, though she knew her parents were not supposed to be

4

together. The social worker reminded Mother there was an active restraining order, and that the parents had agreed as part of the case plan to have a third-party present when they were together with Z.P. Mother was advised that the purpose of voluntary services was to teach parents how to deescalate and avoid violence, and if there were to be another violent incident, greater intervention might be required.

Grandmother believed the parents continued to see each other when the restraining order was in effect.

In December 2024, the parents requested termination of their respective restraining orders.

In January 2025, the Agency received another referral alleging neglect and emotional abuse by Mother. Grandmother told the Agency she asked Mother to stop yelling on the phone in a call with Father. Mother began cussing at Grandmother and threw something at Grandmother that hit the wall. Z.P. was in the room with Grandmother when the argument happened. Father came to the house and Mother left with him for three hours. When they came back, Mother had marijuana and Father had a bong.

Z.P. said she heard Mother yell at Grandmother and saw Mother throw something at Grandmother that hit the wall. Mother said some bad words after that, then left the room. Z.P. was afraid she was going to get hurt.

Mother told the Agency she waited for Grandmother to arrive home from work so she could leave Z.P. with her. Mother went to the store on her own and drank four bottles of Crown Royal whiskey and "blacked out." She did not remember anything that happened after that. She later learned from Father that she had asked him for a bong. She said Z.P. did not see her drinking but did see her argue with and throw something at Grandmother. Mother told the Agency she used marijuana for pain management related to

5

a medical condition.  She did not have a medical marijuana card or prescription but intended to get one.

Father said he would only have concerns for Z.P. being with Mother if Mother is drinking.  He described her as a "mean drunk."

Mother was reminded of the safety plan which required Mother not to engage in violence in front of Z.P.  Mother agreed to continue to participate in voluntary services.  Both parents agreed again to have a third-party present when they were together with Z.P.

Throughout the voluntary services case, Grandmother primarily took care of Z.P. during times when the custody arrangement permitted Z.P. to be in Mother's custody.  Grandmother reminded Mother to wake up and get Z.P. ready for school.  Grandmother prepared Z.P.'s school clothes, fixed her hair, and packed her lunch.  Grandmother worried that if she were not home Mother would not take Z.P. to school.  Grandmother picked up Z.P. from school and prepared her bath in the evening.  Grandmother said Mother did not do anything for Z.P.  Mother left moldy dishes unattended in the house and smoked marijuana outside on the patio up to three times a day.  On at least two weekends in January 2025 when Mother had custody of Z.P., Mother spent the night elsewhere and left Z.P. with Grandmother.  On one of those weekends, Z.P. had a 102-degree fever when Father dropped her off with Grandmother on a Friday.  Mother did not return until Sunday evening.  Grandmother believed Mother had been with Father.  Neither parent took Z.P. to the doctor or addressed her fever.

One day in February 2025, Grandmother had to go to work early and could not get Z.P. ready for school.  Through "the Ring" camera, Grandmother told Z.P. to get ready.  She saw Mother get upset at Z.P. and throw a shoe at Z.P., which made Z.P. cry.  Mother cursed at Grandmother through the video

6

camera and turned the camera off.  On another occasion in February, Grandmother said she discovered the stove was on when she came home from work.  Mother has told Grandmother she wanted to take Z.P. and move out and never see Grandmother again.

Late in February 2025, the Agency received what amounted to the ninth referral alleging neglect of Z.P. by Mother.  In March 2025, the Agency filed a petition and a Protective Custody Warrant on Z.P.'s behalf due to the following February 27, 2025 incident and Z.P.'s exposure to violence since July 2024.

On February 27, 2025, Z.P. said she yelled at Mother to wake up but Mother was not moving.  For over 10 minutes Z.P. tried to wake Mother but then went to the Ring camera to tell Grandmother that Mother was not waking up.

Grandmother said Mother got up early that morning to smoke on the patio and then Mother went back to bed.  Grandmother later woke Mother to get Z.P. ready for school.  Once she saw Mother awake, Grandmother left for work.  At work she saw Z.P. on the Ring camera saying Mother was not responsive.  Grandmother called the police.

Mother said she woke up and got Z.P. ready for school but needed to lay down to rest her eyes.  She did not remember falling asleep.  She said she could see floaters, had a shadow around her eyes, and her eyes were swollen.  According to Mother, law enforcement took her to the hospital, and medical personnel said Mother had an allergic reaction to marijuana.  Mother presented medical records showing she had conjunctivitis, a rash, and a general allergic reaction.  Mother told the Agency she got the marijuana from Father two weeks earlier and was smoking it daily.  She said she had thrown away the marijuana that made her sick and got new marijuana from Father.

7

A few days later, when Z.P. described the incident to the social worker, Z.P. said she did not have breakfast that morning or dinner the night before, and there was not much food in Grandmother's house. Z.P. said Mother smokes on the balcony and Z.P. stays away so she does not get smoke on her. Mother acts mostly happy after she smokes. Mother lies down most of the day after taking her medicine. That same day, Mother unplugged the Ring camera so Z.P. could not talk to Grandmother because Mother "didn't want an argument," according to Z.P.

In March 2025 the Agency asked Mother to agree to a new safety plan. Mother refused and ordered the social workers to leave her house. The Agency recommended that Father seek modification of the custody order in family court. Father did so but his motion was denied. The parents signed a new safety plan under which Mother agreed to be supervised, while with Z.P. at all times, and to continue mental health treatment.

During the period when the Agency was offering voluntary services, the Agency believed Mother did not make substantive progress in her case plan. Mother attended three domestic violence classes but stopped at the end of January 2025. She skipped four drug tests, and her tests in September, October, November, and December 2024 and January and February 2025 were positive for marijuana and/or THC. Mother was inconsistent in attending substance abuse programs at McAlister, and did not complete any parenting education sessions. Mother also skipped her psychiatry appointments.

Meanwhile, Father enrolled and regularly attended domestic violence and parenting education sessions. He completed all of his drug tests, with all negative results.

## II

*Detention and Jurisdictional Hearings*

At a March 2025 detention hearing, the juvenile court found jurisdiction and detained Z.P. with Father, ordered the parents not to have physical contact, and required a third-party to be present for visitation exchanges.  Mother and Father could speak on the phone solely to discuss Z.P., but Father was not permitted to supervise Mother's phone calls with Z.P.  Mother could have supervised visits, and Grandmother could have unsupervised overnight visits as long as Mother was not home.

Following the detention hearing, Z.P. remained with Father.  In April 2025, Z.P. told the social worker she wanted to live with Father, and also with Grandmother and Mother.  She was not scared at either house.  Z.P. said sometimes Mother and Father fought, but they were trying not to, and their last argument was a long time ago.  Z.P. was worried about Mother smoking and drinking and told her to stop.  She said Father quit smoking and drinking a long time ago.  Z.P. described her visits with Mother and Grandmother as "the best."

Father completed his substance abuse treatment and continued to attend a substance abuse recovery group with his church.  He attended in-home parenting education and domestic violence perpetrator meetings.  He hoped to share custody of Z.P. with Mother once Mother stabilized.

Mother admitted that she took a shot of alcohol after the detention hearing and then went directly to substance abuse treatment at McAlister.  Mother tested positive for marijuana on April 1 and April 15, 2025.  On April 21, Mother tested positive for cocaine.  She denied using cocaine.  Mother explained that she went on a date with someone who put cocaine in her drink

without her knowledge. She admitted she saw her date use cocaine, but she immediately left his house.

Mother had been discharged twice from substance abuse treatment before reenrolling in March 2025. By May, she had 13 unexcused absences and had tested positive for marijuana, alcohol, and cocaine. Mother had also been discharged from her domestic violence group due to missing eight sessions between January and March, before resuming the day before the jurisdictional hearing in May.

At the jurisdictional hearing in May 2025, Grandmother testified she was willing to allow Mother and Z.P. to live in her home. She would follow the court's orders. If she believed Mother was drinking or using marijuana, she would make sure that Z.P. was safe within Grandmother's bedroom, then would ask Mother to leave, call the social worker or call the police. Grandmother had multiple cameras in the house that sent her alerts on her watch and phone when anyone moved inside the home.

Grandmother believed the court should trust her to keep Z.P. safe because she had been doing it the whole time. She had called the police on both parents and was honest with the social workers. She had kicked Mother out of her house before and would be willing to do it again and care for Z.P. herself. She loved Z.P. very much and said she was Z.P.'s safe place.

The juvenile court sustained the allegations in the petition and found Z.P. to be a person described by section 300, subdivision (b)(1). Finding there were no reasonable means to prevent removal from Mother, the court removed Z.P. from Mother's custody and kept her placed in Father's custody. The court also ordered the Agency to provide family maintenance services to Father and enhancement services to Mother. It ordered supervised visits for Mother and Z.P. and set a six-month review in November 2025.

## DISCUSSION

### I.

*Legal Principles*

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*N.M.*).)  The court has broad discretion in selecting a disposition that serves the child's best interests.  (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

Section 361 provides in pertinent part:  "A dependent child shall not be taken from the physical custody of their parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention."  (*In re D.B.* (2018) 26 Cal.App.5th 320, 332 (*D.B.*))  "The parent need not be dangerous, and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child."  (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.)

We review a removal order for substantial evidence.  (*In re V.L.* (2020) 54 Cal.App.5th 147, 154 (*V.L.*))  Substantial evidence is evidence that is reasonable, credible, and of solid value.  (*Ibid.*)  Because section 361,

subdivision (c), requires proof by clear and convincing evidence, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*); see also *V.L., supra*, at pp. 154–155 [standard of review described in *O.B.* applies to removal findings under § 361, subd. (c)].) Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment we must "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B., supra*, at p. 1011.) The party challenging the juvenile court's order has the burden to show there is insufficient evidence to support the court's decision. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103; *N.M., supra*, 197 Cal.App.4th at p. 168.)

## II.

### *Substantial Evidence Supports the Dispositional Order*

Mother contends the juvenile court erred in ordering Z.P. removed because there was a reasonable alternative to removal, namely, placing Z.P. with Mother on the condition they live in Grandmother's home. The court considered Mother's request but rejected it. We conclude substantial evidence supports the court's conclusion that this was not a reasonable alternative to removal from Mother.

Since the initiation of the voluntary services case, Mother had not provided consistent and safe care for Z.P. Instead, Grandmother took care of Z.P. During school days, Grandmother handled all the parenting responsibilities, including getting Z.P. ready for school, fixing her hair,

12

preparing her snack and lunch, and preparing her bath. On at least two occasions when Z.P. was supposed to be in Mother's custody, Mother left Z.P. in Grandmother's care for most of the weekend, including once when Z.P. had a fever.

Beyond failing to care for Z.P., in her periods of absence, Mother engaged in behavior that increased risk to Z.P., including use of alcohol, repeated contact with Father, and use of marijuana. In January 2025, Mother left Z.P. with Grandmother to purchase alcohol, blacked out after drinking four bottles of whiskey, engaged in an angry confrontation with Grandmother, then requested and used drugs from Father. In February 2025, Mother used marijuana provided to her by Father, then fell asleep. Z.P. could not rouse her after 10 minutes of trying. While Z.P. got help by contacting Grandmother through the Ring camera, Z.P. was essentially unsupervised for that period. On that occasion and at least one prior occasion, Mother had unplugged or turned off the Ring camera to prevent Grandmother from monitoring Mother.

Even if Mother had an allergic reaction to "bad" marijuana, as she asserts, Mother's decision to use marijuana violated her commitment in her case plan to maintain sobriety. This conduct put Z.P. at risk. Mother's solution to this situation was not to stop using marijuana, but instead to obtain "good" marijuana from Father that would not cause her an allergic reaction. After this incident, Mother continued using drugs, testing positive for marijuana on two occasions and once for cocaine in April 2025. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 217 [trial court may consider the parent's lack of progress in services and "lack of insight into the serious problems parental drug use poses"].)

13

The juvenile court's assessment of Mother's demeanor on the stand as defensive and lacking full insight also supported its disposition order. After participating in a voluntary case for 10 months and signing multiple safety and voluntary services plans, Mother "failed to make substantive progress." Even after the Agency intervened, Mother continued to use alcohol and drugs and did not consistently attend programs. Since Mother failed to fully address the issues that she acknowledged had led to the Agency's referral, the record supports the juvenile court's inference that greater insight and acceptance by Mother were still needed to ensure Z.P.'s safety. (*See D.B., supra*, 26 Cal.App.5th at p. 332 [in considering removal, court may consider the parent's response to the conditions that gave rise to the juvenile court's intervention].)

In rejecting Mother's request that Z.P. be placed in her custody on the condition they live in Grandmother's home, the court explained that although it seemed "the most obvious choice," it was not a reasonable one. In the court's view, such an order really meant Z.P. would be in Grandmother's custody with Mother present, not in Mother's care with Grandmother in a supportive role. We agree with the juvenile court that not only was the proposed placement not a reasonable alternative to removal, it risked putting Z.P. in a more precarious situation than she had been in before. As the court further explained, if Z.P. were placed with Mother, it would not be a simple option for Grandmother to kick Mother out of the house to protect Z.P., as Grandmother had done before and pledged to do in the future. Instead, another hearing would be required to determine whether Z.P. should be removed from Mother and detained with Grandmother at that point. In practical terms, such a placement deprived Grandmother of her ability to enforce the rules against Mother if Mother engaged in risky behavior and

14

Grandmother's ability to ultimately protect Z.P. The juvenile court further concluded it was not a reasonable way to protect Z.P. to count on Grandmother monitoring cameras from work in case Z.P. needed help. And even if Grandmother watched the cameras diligently, this mode of supervision relied on Mother choosing not to turn off the cameras to avoid Grandmother's scrutiny, as Mother had done in the past.

Viewing the record as a whole, and deferring to the trial court's credibility assessment of Mother and the inferences it drew from the evidence, we conclude there was substantial evidence to support the juvenile court's findings, under a clear and convincing standard, that there would be a risk of danger to Z.P. if she were placed with Mother, and that there were no reasonable means to protect her other than removal from Mother's custody.

## DISPOSITION

The juvenile court's disposition order is affirmed.

DO, J.

WE CONCUR:

DATO, Acting P. J.

BUCHANAN, J.

15