Filed 5/27/26  In re B.A. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re B.A., a Person Coming Under the Juvenile Court Law. | B347533<br><br>(Los Angeles County Super. Ct. No. 25CCJP01098A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>A.A.,<br><br>     Defendant and Appellant. |  |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee. Affirmed.

Cheryl Spano, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Deputy County Counsel, for Plaintiff and Respondent.

————————————

The juvenile court asserted dependency jurisdiction over eight-month-old B.A. and removed her from mother's custody. The dependency petition was based on mother's substance abuse. On appeal, mother contends the evidence was insufficient to support the juvenile court's disposition order removing B.A. from mother's physical custody. Mother further argues that the juvenile court failed to independently determine whether the Los Angeles County Department of Children and Family Services (DCFS) made reasonable efforts to prevent B.A.'s removal. She additionally contends that DCFS and the court failed to sufficiently describe the basis for the removal order and the reasonable efforts made to prevent removal. We affirm the juvenile court order.

### FACTUAL AND PROCEDURAL BACKGROUND

In March 2025, mother was hospitalized for abdominal pain.[1] Drug tests completed at the hospital were positive for marijuana and fentanyl. B.A. was four months old. A referral was submitted to DCFS.

During an initial investigation, the maternal grandmother told a social worker that mother and B.A. lived with her. Maternal grandmother helped mother care for B.A. She had not known that mother was using fentanyl. The home appeared safe.

Mother admitted to a social worker that she had used fentanyl for about two or three years and that she regularly

---

[1] All dates are in 2025 unless otherwise noted.

smoked marijuana.  Mother snorted crushed fentanyl pills up to three times a week and used them whenever she felt withdrawal symptoms.  Mother also took Percocet during the first two months of her pregnancy with B.A., when she was still unaware she was pregnant.  She stopped during her pregnancy but "slipped up" once during the middle of the pregnancy.[2]  Mother said she had no more pills and had last used fentanyl the prior weekend.  She still smoked marijuana every night while maternal grandmother watched B.A.  She said the marijuana helped her with anxiety.  At the hospital, she was prescribed several medications, including "buprenorphine-Suboxone."  She had agreed to enter an outpatient substance abuse program and to attend narcotics anonymous meetings.

B.A. attended a daycare operated by mother's maternal aunt.  The aunt had no concerns about B.A. and said she "appears to be well cared for."  Over the course of two DCFS visits, social workers noted B.A. appeared healthy and had no marks or bruises indicative of abuse.  She seemed comfortable with mother.

The maternal great grandmother told a social worker "there was a scare a few years ago when mother was at school in Northridge prior to the baby where, 'I don't think it's considered an overdose, but there was a scare.' "  The maternal great grandmother believed everything changed for mother once she got pregnant and she was now "completely different."

---

[2]     It is unclear if mother was using Percocet during this time, or fentanyl, as she later told a social worker the fentanyl she used came in the form of "fake Percocet" pills.  It is also unclear if mother's statement that she "stopped" during her pregnancy meant she also stopped using marijuana.

Mother agreed to a voluntary safety plan in advance of the detention hearing. She agreed she would remain sober and would not use any substances. She also agreed to enroll and participate in a substance abuse program. She would not breastfeed B.A. and would use maternal grandmother for support. On March 24, mother tested positive for marijuana. In early April, she reported that she was enrolled in an intensive outpatient program that would start on April 10. Mother's case manager from the outpatient program confirmed that she had enrolled in services and random drug testing and was scheduled to attend classes.

DCFS filed a petition alleging B.A. was a person described by Welfare and Institutions Code section 300, subdivision (b), based on the parents' substance abuse.[3] As to mother, the petition alleged she had a history of substance abuse and was currently abusing marijuana, fentanyl, and prescription medication, which rendered her incapable of providing regular care of B.A.

Although DCFS asked the juvenile court to detain B.A. from mother, the court denied the request at the initial hearing. The court conditioned the release to mother on her and B.A. continuing to live with the maternal grandmother or in other

---

[3] All further statutory references are to the Welfare and Institutions Code. Father was noncustodial and had only minimal contact with B.A. It was undisputed that father had a significant, unresolved substance abuse problem. He admitted fentanyl use and tested positive for methamphetamine. The court detained B.A. from father, sustained the petition's allegations as to him, removed B.A. from his custody, and ordered reunification services. Father is not a party to this appeal. We discuss only the facts relevant to mother.

4

DCFS-approved housing, and on mother submitting to weekly random drug testing. The court warned that if mother tested positive, or had any missed or unexcused tests, DCFS was authorized to detain B.A. The court further ordered that mother was to stop using marijuana and the levels of the drug in her test results were to decrease to zero. The court ordered DCFS to provide in-home family preservation services to mother.

In late May, DCFS interviewed mother for the jurisdiction and disposition report. Mother reported that she was now using medication for anxiety but she did not like how it made her feel. She preferred using marijuana to "take the anxiety edge off" and did not believe there was any problem with her using it. She said the drug also helped her to have an appetite and to stay calm. She continued to smoke marijuana nightly before bed, while B.A. was asleep and maternal grandmother was watching her. Mother informed the social worker that "marijuana is legal, and she and her family have a plan to ensure she is using and keeping the baby safe." Because mother was only 20 years old, she obtained marijuana from " 'whoever will sell it to me and some dispensaries who don't card me.' "

As to fentanyl, mother reported she was two months sober. She had started using the drug when she was 17 years old, around three years earlier. She obtained the drug in the form of "fake Percocet" pills, which she crushed and snorted daily.[4] She

---

[4] Father reported that he overdosed on "pills" several times in 2023. On the first occasion, after mother sent him money to buy pills and he was waiting for her, he snorted what he believed must have been "concentrated fentanyl," causing him to overdose. The second time, father was in mother's dorm room when mother spent $300 to buy a large bag of pills. Father " 'hit a big line' " and lost consciousness while mother was out of the room.

used the drug to "feel mellow," and it " 'never crossed [her] mind' " that the drug was dangerous and people had died using it. She admitted struggling to stop using, explaining: " 'obviously[,] because I was addicted, I used for three years.' "  However, she told the social worker she had quit and was ready to stay sober as to fentanyl.  She denied that she had ever been around B.A. while under the influence of marijuana or fentanyl.

The maternal great aunt had B.A. at her daycare every weekday from 8:00 a.m. to 5:00 p.m.  The great aunt had no concerns about abuse, neglect, B.A.'s behavior, or B.A.'s sleep. B.A. was reaching developmental milestones like rolling over and lifting her head.  B.A. had never smelled like marijuana and the great aunt had not noticed mother smelling of marijuana. However, the great aunt did not see mother regularly because maternal grandmother dropped B.A. off at daycare.

In June, a program coordinator from mother's outpatient program informed DCFS that mother was required to submit to drug testing once a week, but she had been sporadic in complying.  In mid-April, mother had tested positive for alcohol. She missed drug tests three times in May.[5]  The jurisdiction and disposition report indicated mother was confused about weekly testing, but DCFS clarified the requirement with her at the end of May.

---

[5]    DCFS submitted test results showing mother was a "no show" for tests on May 8, 13, 21, and 30.  Mother submitted results showing she tested with the outpatient program on May 21.  The test results were positive for marijuana only.  Mother submitted to further drug tests on June 2, 6, 13, 18, and 25.  The June 2, June 6, June 18, and June 25 tests were positive for marijuana.  The June 13 test was negative for all substances.

Mother initially participated consistently in group and individual counseling. But in late June, mother's therapist reported that she was inconsistent with therapy. Mother had attended only three sessions and, as a result, she was discharged from individual therapy in mid-June. The therapist observed that "mother was not receptive to receiving services and had no insight to the reason for her being in the [outpatient] program." The therapist further reported that mother did not want to quit using marijuana and disliked the Suboxone prescribed to her to help treat her fentanyl addiction. Mother said she did not like the therapist and the program was going to connect her with a different one.

Mother told a social worker she was working with her substance abuse counselor to slowly stop using marijuana. When asked how she intended to address her lack of appetite and anxiety without using drugs, mother did not have a plan. She denied any current fentanyl use.

DCFS had initiated family preservation services for mother. Mother canceled or missed several intake appointments, preventing the service provider from assessing B.A.'s safety in the home. Although a social worker reminded mother on May 30 about a scheduled intake appointment for the services on June 3, mother did not show up for the appointment. Mother had similarly missed an initial appointment with the social worker and a medical hub clinic appointment. Mother gave DCFS a written statement asserting, among other things, that she had eventually completed an intake for family preservation services and was now in the assessment process.

At the July jurisdiction and disposition hearing, DCFS asked the court to sustain the petition and remove B.A. from

mother.  DCFS's counsel argued that mother continued to use marijuana, despite the court's admonition that her levels of the drug decrease to zero.  Minor's counsel agreed the court should sustain the petition and declare B.A. a dependent of the court but argued against removal.  Counsel noted mother had not tested positive for fentanyl during the pendency of the case and she had family support to keep B.A. safe.  Mother's counsel argued only about the proposed disposition, contending that the court should not remove B.A. from mother.  According to mother's counsel, mother had completed an intake interview with family preservation services and only used marijuana at night when maternal grandmother was taking care of B.A.

The juvenile court noted mother's ongoing marijuana use created risk because "obviously, marijuana[,] for you led to fentanyl so you need to stop."  The court sustained the petition as pled.  As to disposition, the court ruled: "I am going to detain the child, as the court does find by clear and convincing evidence there is a substantial danger to the minor's physical and mental well-being.  There is no reasonable means to protect without removal.  [¶] And reasonable efforts have been made to prevent the removal."  The court ordered DCFS to provide mother reunification services.  B.A. was placed with maternal grandmother.  Mother timely appealed.

## DISCUSSION

## I. Substantial Evidence Supported the Juvenile Court's Dispositional Order

### A. Legal principles and standard of review

To remove a child from a custodial parent, the juvenile court must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety,

8

protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) Section 361, subdivision (e), requires the court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home . . . . The court shall state the facts on which the decision to remove the minor is based."

"[T]he juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 (*I.R.*).) A child need not be harmed before removal is warranted to avoid such harm. (*In re D.B.* (2018) 26 Cal.App.5th 320, 328; *In re N.M.* (2011) 197 Cal.App.4th 159, 169–170.)

When reviewing a juvenile court's dispositional orders, we determine whether the record contains substantial evidence from which a reasonable trier of fact could have found removal necessary by clear and convincing evidence. (*I.R.*, *supra*, 61 Cal.App.5th at p. 520.) We consider the evidence in the light most favorable to the respondent, giving the respondent the benefit of every reasonable inference and resolving all conflicts in support of the juvenile court's order. " 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." [Citation.] "It is judicial action and not judicial reasoning which

9

is the subject of review . . . ." ' [Citation.]" (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

### B. Discussion

While the parties disputed the extent to which mother's ongoing use of marijuana posed a danger to B.A., it was undisputed that mother had a severe addiction to fentanyl, a highly dangerous drug that she obtained illegally. Mother did not dispute that fentanyl use rendered her incapable of providing adequate care and supervision of B.A. Mother also admitted that prior to DCFS involvement, she was using fentanyl daily. She also admitted struggling to stop using fentanyl. Mother started using drugs when she was 14 years old. A social worker reported that mother said she had never before sought treatment because she "never saw her substance use as an issue." Mother later denied making this statement, informing the court that she knew her fentanyl use was severe and a problem, but she had been unable to stop using the drug previously because the withdrawal symptoms were too bad.

DCFS implemented a safety plan that was designed to allow mother to retain custody of B.A. But although mother initially followed the plan, by the jurisdiction and disposition hearing, her compliance had faltered. Mother attended only a few sessions of individual counseling, which presumably was intended to help her address the causes or triggers of her addiction. She had been discharged from individual therapy.

A report from the substance abuse program coordinator suggested mother's attendance in other aspects of the program had become inconsistent. The coordinator told a social worker: "Prior to our services being held on Zoom and our relocation[, mother] was consistent with her attendance. I will be addressing

10

her participation and treatment plan goals at our next individual counseling session."

Although DCFS had initiated family preservation services, which would enable service providers to monitor B.A.'s safety and care while in mother's home, mother did not show up for a scheduled intake despite a social worker reminder.  The service provider reported that it had difficulty reaching mother; "child safety was unable to be established due to [family's] inability to meet . . . in the month of May"; and "challenges included mother cancelling set appointments."  Although mother represented that the intake appointment occurred before the jurisdiction and disposition hearing, mother's earlier conduct, at a minimum, significantly delayed the services.

Mother was receiving medication-assisted drug treatment to address her fentanyl addiction, but drug test results showed she was not taking it regularly.  Mother instead relied on illegally procured marijuana.  Although mother described having anxiety, which she had previously self-treated, in part, with fentanyl, she did not show up for an appointment with a psychiatrist arranged through the substance abuse program.  When a DCFS social worker asked about the missed appointment, "mother reported that no one reminded her of the appointment, and she does not know the psychiatrist's name."

The record as a whole thus contains substantial evidence from which the juvenile court reasonably could have found it highly probable that B.A. would be in substantial danger if allowed to remain in mother's custody and that there were no reasonable means to protect her without removal. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)  There was evidence of mother's severe fentanyl addiction and even a prior

11

overdose "scare." Mother continued using marijuana and tested positive for alcohol. The juvenile court had already ordered, and DCFS had facilitated and monitored, several measures to protect B.A. while she remained in mother's custody. Mother complied with some of the measures but disregarded others.

Further, while mother had the support of family members, they told DCFS they were completely unaware of her prior fentanyl addiction. The family members' statements did not suggest they were likely to know if mother relapsed on the drug. The juvenile court could reasonably conclude that this lack of awareness prevented the family members from being able to ensure that B.A. would not be in mother's care if mother is under the influence of fentanyl.

Similarly, the juvenile court could find, by clear and convincing evidence, that there were no reasonable means to protect B.A. without removing her from mother's custody. DCFS had implemented a safety plan ordered, in part, by the juvenile court, but mother's compliance with that plan had grown worse as time passed. Critically, mother had not participated in the in-home services that would allow social workers to regularly assess B.A.'s safety while in mother's care. She canceled appointments, including on July 1, only days before the jurisdiction and disposition hearing.[6] Mother further had only partially engaged in the substance abuse program, including by having a period of only sporadic drug testing, being discharged from individual therapy, failing to follow through with psychiatric treatment, and not using medication-assisted drug treatment.

---

[6] Mother said the interview conflicted with her classes at the substance abuse program, yet she had previously confirmed the appointment.

Mother relies on evidence that the substance abuse program coordinator described her as consistently participating in group counseling and individual counseling, and mother had gained insight into her substance use. Yet, this assessment was provided in early June. By early July, mother had been discharged from individual counseling, her individual therapist opined that mother was not receptive to receiving services, and the same program coordinator intended to "address" mother's participation with her at their next session.

Mother also argues that there is "absolutely no correlation to mother's parenting and ability to keep [B.A.] safe and her engagement in therapy." She contends missing appointments was irrelevant. We disagree. Mother ignores that a critical service she had not received due to multiple missed appointments was in-home services, described above. Further, mother told a social worker early in the case that she suffered from anxiety. While she described using marijuana to treat that condition, she also told a social worker that she used fentanyl because it made her "feel mellow" and she used both substances to "[take] the edge off." She also said she did not know why she had used fentanyl, but admitted she had struggled and used the drug for three years. The juvenile court could reasonably infer from this evidence that therapy was included in the substance abuse program as an important part of a plan to assist mother in understanding her addiction and enabling her to stay sober.

Mother relies on cases such as *I.R., In re M.V.* (2022) 78 Cal.App.5th 944, and *Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, as examples of the proper application of section 361, subdivision (c). These cases, however, do not suggest reversal is required in this case. All three involved domestic

13

violence. In each case, the parent challenging the juvenile court orders had demonstrated an ability to avoid further violent encounters, and, aside from the violence with another adult, the children were not at risk in the parent's custody. This case is different. The risk posed to B.A. arises directly from mother's individual conduct. Unlike the parents in *M.V.* and *Georgeanne G.*, mother was decreasing her participation in services designed to address the problems leading to jurisdiction. While these cases on which mother relies explain the relevant law, they are not analogous to this case.

*In re L.G.* (2026) 118 Cal.App.5th 1208, is also distinguishable. In *L.G.*, the appellate court concluded the child welfare agency did not show there were no reasonable means by which the child's physical health could have been protected without removal. The agency did not present evidence showing "it had explored interventions to mitigate remaining sources of risk and determined they were infeasible." (*Id.* at p. 1232.) It did not "[explore] a family maintenance plan under which mother would receive regular counseling, in-home services, parenting supports, or regular check-ins from a social worker." (*Ibid.*) The opposite is true here. DCFS created a plan designed to mitigate sources of risk that involved mother's participation in a substance abuse program that included counseling and in-home services. Mother prevented the in-home services from getting fully underway by missing or canceling appointments, and she ceased consistent participation in several aspects of the substance abuse program. Social workers reported mother canceling check-in appointments. She declined treatments for her addiction and anxiety other than marijuana. Here, the

14

juvenile court could reasonably conclude DCFS met its burden of proof.

We also reject mother's contention that the juvenile court failed to independently determine whether DCFS made reasonable efforts to prevent removal. As we understand mother's argument, the contention is based on the asserted lack of substantial evidence to support the findings and the court's statements regarding mother's marijuana use. As discussed above, we conclude substantial evidence supported the finding, by clear and convincing evidence, that there were no reasonable means to protect B.A. without removal. DCFS implemented a detailed safety plan before the jurisdiction and disposition hearing to allow B.A. to remain in mother's care. The DCFS reports detailed the agency's efforts to facilitate that plan, yet mother failed to comply with several important protective measures. The juvenile court admitted the reports into evidence and considered them. Although the court focused its oral statements on mother's marijuana use, the evidence amply supported the court's finding that DCFS made reasonable efforts to prevent removal. We have no basis to conclude that the finding was not based on the court's independent assessment of the evidence.

Finally, mother contends the jurisdiction and disposition report failed to comply with California Rules of Court, rule 5.690(a)(1)(B)(i), and the juvenile court failed to comply with the section 361, subdivision (e) requirement that the court "state the facts on which the decision to remove the minor is based."

We disagree that DCFS failed to comply with California Rules of Court, rule 5.690(a)(1)(B)(i), which requires that a social study recommending removal include a discussion of the

15

reasonable efforts made to prevent or eliminate removal. While a section of the DCFS report titled "reasonable efforts" may have been conclusory, much of the rest of the report was devoted to describing the efforts DCFS had made to prevent removal. The reports described the safety plan, the social workers' communications with service providers, and efforts to encourage and help mother to comply with the plan. This satisfied California Rules of Court, rule 5.690(a)(1)(B)(i).

To the extent the juvenile court failed to state facts on which the removal decision was based, we find any error harmless. After considering the entire record, we conclude it is not reasonably probable that a result more favorable to mother would have been reached had the court made the required findings under section 361, subdivision (e). (*In re L.O.* (2021) 67 Cal.App.5th 227, 246–247; *In re D.P.* (2020) 44 Cal.App.5th 1058, 1068.)

## DISPOSITION

The juvenile court order is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ADAMS, J.

We concur:

EGERTON, Acting P. J.

HANASONO, J.